**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| CHICAGO CUBS BASEBALL CLUB, LLC,<br>Plaintiff,<br>v.<br>AIDAN DUNICAN, an individual; AND ROOFTOP BY THE FIREHOUSE, INC. d/b/a WRIGLEY VIEW ROOFTOP,<br>Defendants. | Case No. 24-cv-05086<br><br>Honorable Judge Sharon Johnson Coleman |

**MOTION TO DISMISS**

Now Come Defendants, Aidan Dunican ("Dunican") and Rooftop By The Firehouse, Inc. d/b/a Wrigley View Rooftop (collectively, "Wrigley View") and, for their motion to dismiss pursuant to Rule 12(b)(3) of the Federal Rules of Civil Procedure, state as follows:

**INTRODUCTION**

Chicago Cubs Baseball Club, LLC ("the Cubs")—one of the preeminent Major League Baseball teams in the City of Chicago—claims their neighbor, Wrigley View—a local business and event center—unfairly competes to sell tickets to view Cubs games and other events that take place *at Wrigley Field*. (Comp. ¶ 1 (emphasis added)). Wrigley View is among the many local businesses in the "Wrigleyville" neighborhood offering goods and services to Cubs fans and profiting from their proximity to Wrigley Field, where the Cubs host their home baseball games and other events. Wrigley View, which is located at 1050 W. Waveland Avenue (*i.e.* across the street from Wrigley Field outside the left field wall), is unique because, as its name suggests, it has a view from its rooftop to the inside of Wrigley Field.

Wrigley View sells licenses to access their rooftop to enjoy the unique view it provides, as well as food and beverages to enhance the experience. They do not sell access to Wrigley Field or events taking place there. The Cubs, on the other hand, are the sole business in the neighborhood

which operates a professional baseball team. The Cubs sell licenses to access Wrigley Field to view baseball games and other live events, as well as concessions and memorabilia.

This is the Cubs' second swing at Wrigley View claiming the local business unfairly competes with the Major League Baseball team and unjustly misappropriates Cubs' property by virtue of Wrigley View's view into Wrigley Field. The Cubs' first swing came in 2002 when the Cubs sued Wrigley View's predecessor, Aidan, Inc., then the entity through which Defendant Dunican owned the rooftop business and property, and ten other similar local businesses (collectively, "the Rooftops"), in a civil lawsuit entitled *Chicago National League Ball Club. Inc., v, Skybox on Waveland. et al.*, No. 1:02-cv-09105 ("*Rooftops I*"). *See*, *Skybox Third Amended Complaint*, attached as Exhibit 1. In the interest of avoiding trial of that matter, the parties reached a settlement ("the Settlement Agreement," attached as Exhibit 2) wherein the parties agreed to, among other things, arbitrate disputes arising out of the Settlement Agreement. The Settlement Agreement also included a 20-year license to use the marks which the Cubs allege Wrigley View is now infringing. That license expired December 31, 2023; however, the arbitration provision did not.

Shortly after the Settlement Agreement was entered into, Dunican transferred/assigned the rights and obligations of his rooftop business, including the Settlement Agreement, from Aidan, Inc. to Wrigley View, also owned solely by Dunican, in accordance with Section 5 of the Settlement Agreement, which made Wrigley View a successor party to the Settlement Agreement. As the Cubs note in their Complaint, the Cubs essentially consider Wrigley View to have been a party to the agreement for decades. (Comp. ¶¶ 2, 22, 47.)

In their Complaint, the Cubs allege identical claims to those settled by the Settlement Agreement and their current trademark claims are really breach of contract claims arising out of the license granted in the Settlement Agreement. That is, all their claims arise out of the Settlement Agreement and are subject to the arbitration provision. The Cubs have chosen the wrong venue to

pursue their claims. The Court, therefore, should dismiss this action under Rule 12(b)(3) for improper venue.

## BACKGROUND

The Cubs current lawsuit ("*Rooftops II*") purports to state claims for misappropriation (Count I); unjust enrichment (Count II); Federal Trademark Infringement (15 U.S.C. 1114(1)) (Count III); Federal Unfair Competition (15 U.S.C. 1125(a)(1)(A)) (Count IV); False Advertising (15 U.S.C. S 1125(a)(1)(B)) (Count V); Illinois Uniform Deceptive Trade Practices Act (815 ILCS 510/2) (Count VI); and Illinois Common Law Unfair Competition (Count VII). Likewise, in *Rooftops I*, the Cubs alleged copyright infringement, violations of the Lanham Act, misappropriation, and unjust enrichment, based, in part, on Wrigley View's predecessor's view into Wrigley field and use of the Cubs' marks. Ex. 1 at 9–17. The Cubs brought Rooftops I against the Rooftops, local businesses with rooftops that have a view into Wrigley Field.

### Wrigley View is a Local Business Operating an Event Center

Defendant Aidan Dunican is an individual who resides in Illinois, and is the founder, president, secretary, and director of Wrigley View. (Dkt. 1 ¶ 6.) Dunican previously owned Aidan, Inc. and is a signatory to the Settlement Agreement. Ex. 2 at 10. Wrigley View operates a 4,200 square foot rooftop facility that can accommodate up to 200 guests and offers outdoor seating with—as its name suggests—views of Wrigley Field. (*Id.* ¶ 18.) Dunican, in the Cubs' telling, has "knowledge of the property rights the Cubs hold in their live games and intellectual property, and is aware of the value that Wrigley View Rooftop gains by feigning a partnership with the Cubs." (*Id.* ¶¶ 6, 17.) The Cubs theorize that Wrigley View sells individuals and groups "performances of Cubs baseball and other events," when in fact they sell access to their rooftop and facilities, which has a view of events taking place in Wrigley Field. (*Id.* ¶¶ 19, 26, 40.) The Cubs contend that Wrigley View's "sole business is selling tickets to watch Cubs games and other events that take place in Wrigley Field." (*Id.* ¶ 27.) Wrigley View advertises and sells tickets to its facilities on its

website and social media. (*Id.* ¶ 25, 29–31.) Wrigley View does not contribute to the Cub's expenses in operating a Major League Baseball team. (*Id.* ¶ 20, 41.) The Cubs speculate that Wrigley View intentionally misappropriates the Cubs' property while making hundreds of thousands of dollars annually. (*Id.* ¶ 21.) Wrigley View has operated its business, including the use of the marks which the Cubs allege Wrigley View is now infringing, "for decades" with a license from the Cubs, which they no longer have for the 2024 Major League Baseball season. (*Id.* ¶¶ 2, 22.) The Settlement Agreement details the terms of that license. Ex. 2 § 7. The Cubs allege that, although Wrigley View no longer has a license from the Cubs, it has "sold tickets to Cubs games for the 2024 season." (*Id.* ¶ 42.)

**The Cubs are in the Major League Baseball Business**

The Complaint alleges the following: Plaintiff Chicago Cubs Baseball Club, LLC owns and operates the Chicago Cubs, a Major League Baseball team which has played their home baseball games at Wrigley Field in Chicago, IL since 1916. (*Id.* ¶ 9.) The Cubs spend hundreds of millions of dollars annually to compete in Major League Baseball and to maintain Wrigley Field. (*Id.* ¶¶ 10–12.) The Cubs capitalize on their investment, in part, by selling tickets to attend baseball games and other events at Wrigley Field. (*Id.* ¶ 13.) The Cubs sell concessions and memorabilia throughout the stadium and broadcast the game throughout the park. (*Id.*) "The Cubs sell the experience of viewing live Cubs baseball as it happens." (*Id.* ¶ 14.) The Cubs believe they have a valuable property right "in and to the live performance of Major League Baseball at Wrigley Field," and part of that right is its interest in its distinctive tradenames, trademarks, and logo. (*Id.* ¶¶ 15–16, 40.) Those marks include: "CHICAGO CUBS" (U.S. Registration 1548675), the Cubs logo (U.S. Registration 869838), and "CUBS" (U.S. Registration 3231136), (the "Cubs' Marks"). (*Id.* ¶ 16.) The use of these marks was at issue in *Rooftops I* and was covered by the Settlement Agreement. Ex. 1 ¶ 43; Ex. 2, Ex. B. The Settlement Agreement allowed Wrigley View to use the Cubs' Marks for a term of twenty years ending on December 31, 2023. Ex. 2 §§ 4, 7. The Cubs

allege that Wrigley View has used the Cubs' Marks beyond the scope of the license contemplated in the Settlement Agreement. (Dkt. 1 ¶ 2, 3, 5, 22, 23, 27, 28, 36, 41, 42, 44.)

**Alleged Misappropriation and Unfair Infringement**

The Cubs contend: There is "no public right to a live Cubs game or its broadcast," and yet Wrigley View "seek[s] to take and sell the Cubs' property for their sole unjust economic gain, without a license from the Cubs." (*Id.* ¶ 23.) The Cubs expressly told Wrigley View that they have no right to sell tickets to view Cubs games for the 2024 season or use the Cubs' intellectual property. (*Id.* ¶ 24.) Despite the Cub's admonishment, Wrigley View continues to operate and the Cubs allege "continue[s] to sell tickets to Cubs games in 2024 without a license." (*Id.* ¶¶ 25–28.) Wrigley View takes "full advantage of a non-existent relationship and association with the Cubs." (*Id.* ¶ 28.) The Cubs theorize that Wrigley View's infringement is two-fold: first, Wrigley View uses the Cubs' Marks on their website and in brochures with complete knowledge of the Cubs' rights in their marks, and, second, Wrigley View advertises it that is an "Official Cubs Partner" and is "officially endorsed by the Chicago Cubs" with the willful intent to cause confusion among consumers and capitalize on the Cubs' goodwill. (*Id.* ¶¶ 28, 38, 57, 66.) The Cubs say those statements are false and Wrigley View knows it: the Cubs are not partners with and do not endorse Wrigley View. (*Id.*) Such marketing, the Cubs say, is false advertising and is "likely to continue to cause consumers to be confused as to the source of Defendants' services and to mistakenly believe that there is an affiliation, association, [endorsement, sponsorship,] or connection between Defendants and the Cubs." (*Id.* ¶¶ 31, 59, 64, 70.) According to the Cubs, Wrigley View has used the Cubs' Marks in their advertising in connection with the sale of goods and services in interstate commerce, specifically, the sale of "tickets to view events and games in Wrigley Field from Wrigley View Rooftop's rooftop." (*Id.* ¶¶ 58, 63, 69, 78.) By doing so, the Cubs say, Wrigley View misrepresents and deceive consumers as to the nature, characteristics, qualities of their goods and services, and thereby are likely to influence purchasing decisions and adversely affect the

Cubs' ticket sales and business. (*Id.* ¶¶ 71–73.) The Cubs conclude that Wrigley View's use of the Cubs' Marks and claimed affiliation with the Cubs in their advertising constitute willful deceptive trade practices and unfair competition. (*Id.* ¶¶ 78–80, 85–86.)

**Alleged Damages**

The Cubs feel Wrigley View is unjustly enriched at the Cubs' expense and misappropriates the Cubs' property. (*Id.* ¶ 33, 83.) In the Cubs' view, Wrigley View unlawfully "take[s] the Cubs' property and divert the Cubs' revenues to themselves … without compensating the Cubs for any of the costs required to, among other things, field a team and operate a ballpark in order to participate in Major League Baseball." (*Id.* ¶¶ 46, 48.) The Cubs speculate that "[b]y unlawfully taking the Cubs' property and using it as the essential part of their business … Defendants obtain a windfall and are unjustly enriched." (*Id.* ¶ 48.) The Cubs conclude "a major part—if not all—of the revenue Defendants earn from their rooftop business is revenue that would otherwise flow to the Cubs." (*Id.* ¶ 34.) The Cubs believe that as long as admission to Wrigley View's facility is available, fans may go there instead of into the ballpark. (*Id.*) According to the Cubs, Wrigley View's misappropriation of the Cubs' property rights in Cubs games diverts gate, concession and other receipts to Wrigley View. (*Id.* ¶ 35.)

The Cubs also contend Wrigley View's use of the Cubs' trademarks and tradenames—"which fans associate with the Cubs and the history and reputation the Cubs work hard to cultivate"—damages their reputation, on which they have spent "billions." (*Id.* ¶ 36.) According to the Cubs, Wrigley View's "conduct threatens the Cubs' reputation and brand loyalty by misleading fans to believe their experience at Wrigley View Rooftop is representative of the experience they would have at Wrigley Field." (*Id.* ¶ 37.) The Cubs think that Defendant's use of the Cubs' Marks and their false claim that Wrigley View Rooftop is endorsed by and associated with the Cubs deceives customers. (*Id.*) In their view, as long as Wrigley View "continue[s] to advertise the nonexistent partnership, fans have no reason to assume anything but that the Cubs

endorse Wrigley View Rooftop." (*Id.* ¶ 38.) The Cubs allege "Defendants' activities adversely affect the Cubs' ticket sales and business in interstate commerce." (*Id.* ¶ 65.)

Because of these alleged damages, the Cubs seek an order recognizing their exclusive property rights in Cubs games and prohibiting Wrigley View from selling tickets to view Cubs games played in Wrigley Field without a license. (*Id.* ¶ 44.) The Cubs also seek monetary damages caused by Wrigley View's unlawful advertisement and sale of tickets to Cubs games for the 2024 Major League Baseball season. (*Id.*) The Cubs feel they are additionally entitled to disgorgement of Wrigley View's "improper and unlawful" profits; statutory damages and penalties; punitive damages; treble damages pursuant to 15 U.S.C. 1117(a); a finding that Wrigley View's conduct is exceptional under 15 U.S.C. 1 1 17(a); attorney's fees; and a permanent injunction.

**Previous Suit and Settlement of *Rooftops I***

The Cubs brought a previous action against the Rooftops which named Aidan, Inc. among the rooftops allegedly taking the Cubs property. *See*, Ex. 1. Aidan, Inc. is Wrigley View's predecessor in interest and named after Defendant Aidan Dunican. That suit alleged virtually identical claims relating to the Cubs' alleged property right in the Rooftop's views into Wrigley Field and their use of the Cubs' intellectual property. Ex A. The same marks at issue here were at issue in *Rooftops I*, where the Cubs asserted violations of the Lanham Act § 43(A), 15 U.S.C. § 1125(A), based on the Rooftops' use of those marks. (Ex. 1 ¶¶ 42–44.) For the last twenty years, the Settlement Agreement in *Rooftops I* has governed Wrigley View's use of the Cubs' Marks. (Ex. 2 § 7.2; Ex. B.) The terms of use of those marks under the Settlement Agreement expired on December 31, 2023. *Id.* § 4.1. *Rooftops I* also stated claims for misappropriation (*id.* ¶¶ 46–50) and unjust enrichment (*id.* ¶¶ 51–54) which are virtually identical to those claims asserted here and arise out of the same set of operative facts, namely, that Wrigley View profits by selling access to its rooftop with views of Wrigley Field.

The Settlement Agreement stated its purpose was to "avoid the expense and uncertainty of a trial," and to compromise and settle the dispute raised in *Rooftops I*, and "to resolve all the claims that were or could have been brought in [*Rooftops I*] without any admission of fault or determination as to the merits...." *Id.* at 1. Under Section 4.2, the Settlement Agreement provides that it is "without prejudice to [the Rooftops' and] the Cubs' ability to assert a license or other permission from the Cubs is [or is not] required for the right to sell admission to view Games from the Rooftops." *Id.* § 4.2. Section 5.2 also provided that the agreement shall bind the Cubs and each Rooftops successors. *Id.* § 5.2. Section 9 provided "all disputes arising under this Agreement shall be arbitrated according to the rules of the American Arbitration Association…." *Id.* § 9.

## STANDARD

A motion to dismiss under Rule 12(b)(3) for improper venue is the appropriate procedure when a litigant seeks to dismiss a lawsuit based on an arbitration agreement. *Faulkenberg v. CB Tax Franchise Sys., LP*, 637 F.3d 801, 808 (7th Cir. 2011). Under Rule 12(b)(3), district courts may consider materials outside of the pleadings, including the parties' arbitration agreement. *Continental Cas. Co. v. Am. Nat. Ins. Co.*, 417 F.3d 727, 733 (7th Cir. 2005). In determining whether an agreement's arbitration clause controls, federal courts apply state-law principles of contract formation. *Gupta v. Morgan Stanley Smith Barney, LLC*, 934 F.3d 705, 710 (7th Cir. 2019). "Generally, federal policy favors arbitration, and once an enforceable arbitration contract is shown to exist, questions as to the scope of arbitrable issues should be resolved in favor of arbitration." *Scheurer v. Fromm Family Foods LLC*, 863 F.3d 748, 752 (7th Cir. 2017).

## ARGUMENT

Perhaps dissatisfied with their below .500 winning percentage, the Cubs seek to convince the Court that they compete, not with the NL Central, but with their neighbors at Wrigley View. The Major League Baseball club has sued this neighbor, again, over alleged damages to this reputation and alleged lost profits which they attribute to this neighbor selling tickets to that

neighbor's own rooftop, which location has had a view of Wrigley Field for over a century of Cubs' home games. Of course, a neighbor selling rooftop access to a view of Wrigley Field—and any other of the hundreds of businesses in the "Wrigleyville" neighborhood which capitalize on their proximity to Wrigley Field—do not compete with the Cubs, either in baseball or business. *See, e.g.*, *Right Field Rooftops, LLC v. Chicago Baseball Holdings, LLC*, 87 F. Supp. 3d 874, 887 (N.D. Ill. 2015) ("the Cubs necessarily compete with other Major League Baseball teams, sporting events, and other live entertainment for revenue…") Their claims are as specious now as they were in 2002 when they first asserted them. However, if the Cubs wish to continue this pursuit, they must do so by the terms of their Settlement Agreement, which requires them to arbitrate. Accordingly, the Court should dismiss their claims with prejudice for improper venue.

The Court must decide whether an enforceable arbitration agreement exists between the Cubs and Wrigley View. Under the Federal Arbitration Act, a provision in a contract agreeing in writing to submit to arbitration an existing controversy arising out of such a contract is "valid, irrevocable, and enforceable." 9 U.S.C. § 2. The federal policy favoring arbitration is relevant to inquiries concerning the scope of an arbitration clause, but not inquiries concerning whether an arbitration clause is valid. *Janiga v. Questar Capital Corp.*, 615 F.3d 735, 740 (7th Cir. 2010). Because an arbitration agreement is a contract, a party cannot be required to arbitrate where they have not agreed to do so. *Gore v. Alltel Comm'cns, LLC*, 666 F.3d 1027, 1032 (7th Cir. 2012).

Federal law places arbitration clauses "on equal footing with other contracts," and "[w]hether a binding arbitration agreement exists is determined under principles of state contract law." *Bahoor v. Varonis Sys., Inc.*, 152 F. Supp. 3d 1091, 1097 (N.D. Ill. 2015) (citing *Janiga v. Questar Capital Corp.*, 615 F.3d 735, 740–42 (7th Cir. 2010)). In construing contracts under Illinois law, "the primary objective is to give effect to the intention of the parties." *Right Field Rooftops, LLC*, 870 F.3d at 689–90. "A court must initially look to the language of a contract alone, as the language, given its plain and ordinary meaning, is the best indication of the parties'

intent." *Gallagher v. Lenart*, 226 Ill.2d 208 (2007). "If the words in the contract are clear and unambiguous, they must be given their plain, ordinary and popular meaning." *Cent. Ill. Light Co. v. Home Ins. Co.*, 213 Ill.2d 141 (2004) (citation omitted). When construing contracts, Illinois courts avoid absurd results. *Smith v. West Suburban Med. Ctr.*, 922 N.E.2d 549, 554 (1st Dist. 2010). The party opposing arbitration "bears the burden of demonstrating the arbitration agreement is unenforceable and the claims are unsuitable for arbitration." *Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 91–92 (2000). Courts resolve any doubts concerning arbitrability in favor of arbitration. *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983). A Rule 12(b)(3) motion to dismiss for improper venue may be granted if there is "a written agreement to arbitrate, a dispute within the scope of the arbitration agreement, and a refusal to arbitrate." *Zurich American Ins. Co. v. Watts Indus., Inc.*, 417 F.3d 682, 687 (7th Cir. 2005).

Here, the determination of whether venue is proper is a two-step inquiry. First, is the arbitration agreement binding? Second, are Plaintiff's claims precluded by the arbitration agreement? *See, e.g., Ticketreserve, Inc. v. Viagogo, Inc.*, 656 F. Supp. 2d 775, 779 (N.D. Ill. 2009) ("[T]he Court must ... determine whether there is an agreement to arbitrate and if so, whether the underlying dispute is within its scope."). The Cubs cannot in good faith argue that they did not form a binding contract with Wrigley View's predecessor in interest, Aidan, Inc., in order to settle the claims brought in *Rooftops I* or that the Settlement Agreement did not contain an arbitration provision covering disputes arising out of the agreement. The sole question is whether the Cubs claims here are covered by the Settlement Agreement. They are. The misappropriation and unjust enrichment claims are identical to those brought and settled in *Rooftops I* and concern the same claimed property right in the view into Wrigley Field. The trademark claims are also identical to the those brought and settled in *Rooftops I* and concern Wrigley Views' use of the Cubs Marks. As such they are claims arising out of the Settlement Agreement.

The *Rooftop I* claims are identical to the claims asserted here. In fact, the misappropriation claim here, Count I, is nearly a word for word copy of the *Rooftops I* misappropriation claim. Each concerns the Cubs asserted right to a portion of the profits received from Wrigley View's income derived from selling licenses to their rooftop. When the parties settled those claims, they made their intent abundantly clear. The Settlement Agreement was intended to "avoid the expense and uncertainty of a trial," and to compromise and settle the dispute raised in *Rooftops I*, and "to resolve all the claims that were or could have been brought in [*Rooftops I*] without any admission of fault or determination as to the merits...." *Id.* at 1. Under Section 4.2, the Settlement Agreement provided that it was "without prejudice to [Rooftops' and] the Cubs' ability to assert a license or other permission from the Cubs is [or is not] required for the right to sell admission to view Games from the Rooftops." *Id.* § 4.2. Of course, the settlement of the *Rooftop I* claims was not intended to be temporary. The Parties could and would have included language to that effect if that were the case. Rather the intent was to settle the claims permanently while reserving the right to assert the misappropriation and unjust enrichment claims through arbitration.

The parties' intent is clear and unambiguous in the Settlement Agreement. The parties wanted to avoid trial of these issues and any other related issues back in 2004. It makes no sense that the parties would enter a settlement agreement whereby the Plaintiff could reinstate their lawsuit 20 years down the road. Moreover, by expressly reserving the right to "assert" the validity of a license to view, while settling the lawsuit over the same, the parties expressly contemplated this very situation at the expiration of the term of the Settlement Agreement. Similar types of arbitration provisions have been characterized as extremely broad and capable of an expansive reach. *See Elzinga & Volkers, Inc. v. LSSC Corp.,* 47 F.3d 879, 881 (7th Cir.1995) (describing an arbitration clause committing the parties to arbitrate "[a]ny controversy or claims arising out of or related to the Contract" as broad); *Tracer Research Corp. v. National Envtl. Servs. Co.,* 42 F.3d 1292, 1295 (9th Cir.1994) (noting that language such as "relating to" indicates an arbitration clause

considerably broader in reach than one limited to disputes "arising out of" certain dealings). Broad arbitration clauses, such as the one in the Settlement Agreement, necessarily create a presumption of arbitrability. *Kiefer Specialty Flooring, Inc. v. Tarkett, Inc.*, 174 F.3d 907, 909–10 (7th Cir. 1999).

There is no doubt that claims in this suit are covered by that arbitration provision, but if there were, it would be for the arbitrator to decide. In contracts governed by the Federal Arbitration Act, the threshold question of "whether the parties have submitted a particular dispute to arbitration, *i.e.,* the question of arbitrability," is generally to be decided by the court, not the arbitrator, "unless the parties clearly and unmistakably provide otherwise." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (1986). The arbitration provision at issue here provides: "all disputes arising under this Agreement shall be arbitrated according to the rules of the American Arbitration Association..." *Id.* § 9. "[W]here the parties agree to arbitration pursuant to the rules of the American Arbitration Association ("AAA"), the parties incorporate the AAA's rules into the arbitration agreement." *Dunston v. R.H. Love Galleries, Inc.*, No. 07 CV 5113, 2008 WL 2339564, at *2 (N.D. Ill. Jun. 4, 2008) (citing *Commonwealth Edison Co. v. Gulf Oil Corp.*, 541 F.2d 1263, 1272 (7th Cir.1976)). Rule 7 of the AAA Commercial Arbitration Rules states, with respect to jurisdiction, that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim." AAA Rule R–7(a). By incorporating the AAA Rules, including Rule 7(a), into the arbitration provision, the Cubs and the Rooftops clearly and unmistakably agreed to give the arbitrator the authority to determine whether their dispute is arbitrable. *See, e.g.*, *Wal-Mart Stores, Inc. v. Helferich Pat. Licensing, LLC*, 51 F. Supp. 3d 713 (N.D. Ill. 2014). Moreover, Arbitration provisions utilizing the "arising from," "arising out of," or "relating to" language have been described as "extremely broad and capable of extensive reach." *Shipp v. XA, Inc.*, No. 06 C 1193, 2006 WL 2583720, at *3 (N.D. Ill. Aug. 31,

2006); *see also, Sweet Dreams Unlimited, Inc. v. Dial-A-Mattress, International, Ltd.*, 1 F.3d 639, 643 (7th Cir.1993) (holding that the "arising out of" language reaches all disputes having their origin or genesis in the contract). Broad arbitration clauses, such as the one present in this case, create a presumption of arbitrability. *Id.*

Even though the license to use the Cubs' Marks terminated, the arbitration provision did not. Under the federal common law of arbitrability, an arbitration provision in a contract is held to survive the termination of that contract unless there is clear evidence that the parties intended to override this presumption. *See, Nolde Bros., Inc. v. Local No. 358, Bakery and Confectionery Workers Union*, 430 U.S. 243, 255 (1977) ("where the dispute is over a provision of the expired agreement, the presumptions favoring arbitrability must be negated expressly or by clear implication.") This presumption in favor of arbitrability can be rebutted if the parties express or clearly imply an intent to repudiate arbitrability. *Sweet Dreams Unlimited, Inc.*, 1 F.3d at 642.

The arbitration agreement in the Settlement Agreement has no express language regarding the survivability of the arbitration provision, but the arbitration provision uses the broad phrases "all disputes" which evinces an intent to submit post-termination claims to arbitration. Given there is no express language that the arbitration agreement terminates at any point, there is a presumption it survives. The Settlement Agreement does contain a survival clause which provides for survival of any term which is equitable. Ex. 2 § 21. Also, the arbitration provision is equitable, and therefore covered by the survival clause, because it allows a predetermined means of alternative resolution. Because the Cubs and the Rooftops could have reasonably concluded that expressly providing for the arbitrability of post-termination claims was unnecessary, particularly where it specifically evinced that the parties may assert rights over the Rooftops' view post-termination. For the same reason, it is reasonable to expect that if they had intended to extinguish the arbitration provision upon the termination, they would have done so explicitly. Had the parties intended the arbitration provision to terminate, they would have done so in the survival clause. Thus, since any doubts

concerning the scope of the arbitration clause must be resolved in favor of arbitration, *Moses H. Cone Memorial Hospital*, 460 U.S. at 24-25, the conclusion must be that the arbitration provision survived termination and covers the claims here.

## CONCLUSION

This lawsuit is the Cubs second swing at Wrigley View over their view into Wrigley Field. When the Cubs settled their first swing, they agreed to resolve future disputes over the view and use of the Cubs' Marks—like the ones raised in this lawsuit—through arbitration. There is a presumption that their claims here are covered by the Settlement Agreement and any doubts as to the arbitrability of the claims here are to be resolved by an arbitrator. Accordingly, Wrigley View requests the Court grant the Motion and dismiss this case with prejudice.

Dated: August 21, 2024

Respectfully submitted,

/s/ J. Timothy Cerney
Attorney for Defendants

J. Timothy Cerney
Carroll, Hartigan & Cerney, Ltd.
218 N. Jefferson Street, Suite 102
Chicago, IL 60661
Phone: 312-236-3575
Cell: 312-590-0233
jtc@chc-law.com
Attorney No. 57183

## CERTIFICATE OF SERVICE

I, J. Timothy Cerney, an attorney, hereby certify that I caused the foregoing document to be filed with the Court's CM/ECF system, which provided electronic notice and a copy of the same to all counsel of record, and I also served the same on Plaintiff's counsel, Timothy Knapp and Kent Hayden by facsimile at 312-862-2200 on August 21, 2024.

/s/ J. Timothy Cerney

FILED
OCT 27 2003 rg
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CHICAGO NATIONAL LEAGUE BALL CLUB, INC., | ) | |
| Plaintiff, | ) | Case No. 02 C 9105 |
| v. | ) | Judge James F. Holderman |
| SKYBOX ON WAVELAND, L.L.C.; QUOIN, LTD.; BEYOND THE IVY, INC.; MURPHY'S ROOFTOP COMPANY; SHEFFIELD-WAVELAND ROOFTOPS, INC.; BRIXEN IVY, L.L.C.; T. LAMB, INC.; AIDAN, INC.; ANNEX CLUB, L.L.C.; TAILGATORS ON NORTHWEST HIGHWAY, INC.; and 3639 L.L.C., | ) | Magistrate Judge Schenkier |
| Defendants. | ) | |

DOCKETED
OCT 28 2003

**THIRD AMENDED COMPLAINT**
**FOR INJUNCTION, DAMAGES AND OTHER RELIEF**

Plaintiff Chicago National League Ball Club, Inc. ("Cubs"), for its Third Amended Complaint against Skybox on Waveland, L.L.C.; Quoin, Ltd.; Beyond the Ivy, Inc.; Murphy's Rooftop Company; Sheffield-Waveland Rooftops, Inc.; Brixen Ivy, L.L.C.; T. Lamb, Inc.; Aidan, Inc.; Annex Club, L.L.C.; Tailgators on Northwest Highway, Inc.; and 3639 L.L.C. ("Defendants"), states as follows:

**NATURE OF ACTION**

1. Plaintiff brings this action because Defendants have unlawfully misappropriated the Cubs' property, infringed its copyrights and misleadingly associated themselves with the Cubs and Wrigley Field. By doing so, Defendants have been able to operate multi-million dollar businesses in and atop buildings immediately outside Wrigley Field and unjustly enrich themselves to the tune of millions of dollars each year, while paying the Cubs



EXHIBIT 1

83

absolutely nothing. Posing as small-time friends of the common fan, Defendant rooftop operators are in fact free-riders who profiteer on Plaintiff's enormous annual expenditures on - and historical investment in - the Chicago Cubs baseball team and Wrigley Field. Defendants profit by unlawfully selling, in direct competition with Plaintiff, Cubs game packages that include seats to view Cubs games live and to watch Plaintiff's telecasts of such games, as well as food and drink, at prices of up to $150 or more per person per game. Defendants' promotional, marketing and other materials, which they use to advance their business interests, are and have been likely to cause confusion, and have caused actual confusion, concerning Defendants' connection or affiliation with Plaintiff and Plaintiff's approval or sponsorship of Defendants' businesses.

2. Except for the rooftop operators and their patrons, essentially everyone who watches Cubs games in person (from fans to members of the media) and every entity that transmits from Wrigley Field live visual and/or oral depictions of Cub games (from telecasters to radio broadcasters to Internet gamecasters) does so pursuant to license from the Cubs, their opponent or Major League Baseball itself. In sharp contrast to everyone else, Defendant rooftop operators take the Cubs' product without license from the Cubs and use it to make millions of dollars in profits for themselves.

3. Defendants are liable to Plaintiff for copyright infringement, violation of the Lanham Act, misappropriation and unjust enrichment, as set forth more fully below.

**PARTIES**

4. Plaintiff Chicago National League Ball Club, Inc. ("Cubs") is a Delaware corporation. The Cubs present their home Major League Baseball games live at Wrigley Field in

Chicago. All of the Cubs home games are telecast, and the Cubs own the copyright in each telecast carried by WGN-TV, WCIU-TV, CLTV or Fox Sports Net Chicago.

5. Defendant Skybox on Waveland, L.L.C., without license from the Cubs, is in the business of selling to the public, in direct competition with the Cubs, rooftop and other seats from which to view Cubs games in person, partake of food and drink, and watch Cubs telecasts ("Cubs game packages"). The Skybox on Waveland facilities are located at 1038 W. Waveland Avenue in Chicago.

6. Defendant Quoin, Ltd., operating under the name Skybox on Sheffield, without license from the Cubs, is in the business of selling Cubs game packages to the public, in direct competition with the Cubs. The Skybox on Sheffield facilities are located at 3627 N. Sheffield Avenue in Chicago.

7. Defendant Beyond the Ivy, Inc., without license from the Cubs, is in the business of selling Cubs game packages to the public, in direct competition with the Cubs. The Beyond the Ivy, Inc. facilities are located at 1010 W. Waveland Avenue and 1048 W. Waveland Avenue in Chicago.

8. Defendant Murphy's Rooftop Company, without license from the Cubs, is in the business of selling Cubs game packages to the public, in direct competition with the Cubs. The Murphy's Rooftop Company facilities are located at 3649 N. Sheffield Avenue.

9. Defendant Sheffield-Waveland Rooftops, Inc., operating under the name Wrigleyville Rooftops, without license from the Cubs, is in the business of selling Cubs game packages to the public, in direct competition with the Cubs. The Sheffield-Waveland Rooftops, Inc. facilities are located at 1032-34 W. Waveland Avenue and 3643-45 N. Sheffield Avenue in Chicago.

10. Defendant Brixen Ivy, L.L.C., without license from the Cubs, is in the business of selling Cubs game packages to the public, in direct competition with the Cubs. The Brixen Ivy, L.L.C. facilities are located at 1044 W. Waveland Avenue in Chicago.

11. Defendant T. Lamb, Inc., operating under the name Lakeview Baseball Club, without license from the Cubs, is in the business of selling Cubs game packages to its "members," in direct competition with the Cubs. "Memberships" are available to the public at annual prices of $50 to $1000 and "members" are entitled to buy Cubs game packages. The T. Lamb, Inc. facilities are located at 3633 N. Sheffield Avenue in Chicago.

12. Defendant Aidan, Inc., operating under the name Rooftop by the Firehouse, without license from the Cubs, is in the business of selling Cubs game packages to the public, in direct competition with the Cubs. The Aidan, Inc. facilities are located at 1050 W. Waveland Avenue in Chicago.

13. Defendant Annex Club, L.L.C., operating under the name Ivy League Baseball Club, without license from the Cubs, is in the business of selling Cubs game packages to the public, in direct competition with the Cubs. The Annex Club, L.L.C. facilities are located at 3637 N. Sheffield in Chicago.

14. Defendant Tailgators on Northwest Highway, Inc., operating under the name Tailgators Rooftop, without license from the Cubs, is in the business of selling Cubs game packages to the public, in direct competition with the Cubs. The Tailgators on Northwest Highway, Inc. facilities are located at 3621-25 N. Sheffield in Chicago.

15. Defendant 3639 L.L.C., operating under the name 3639 Wrigley Rooftop, without license from the Cubs, is in the business of selling Cubs game packages to the public, in

direct competition with the Cubs. The 3639 L.L.C. facilities are located at 3639 N. Sheffield in Chicago.

## JURISDICTION AND VENUE

16. This action arises in part under the Copyright Act, 17 U.S.C. § 101, et seq. and in part under the Lanham Act, 15 U.S.C. § 1051, et seq. This Court has original jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1338 and 1367 and 15 U.S.C. § 1121.

17. Venue is proper under 28 U.S.C. §§ 1391 and 1400.

## FACTUAL BACKGROUND

### A. Property Rights of the Cubs.

18. Plaintiff owns and operates Wrigley Field, the second oldest major league ballpark in the United States, and the Chicago Cubs baseball team, a charter member of the National League. The Cubs provide a variety of seats from which to view open-air games at Wrigley Field, including bleachers, box seats, lower and upper grandstand seats and skyboxes. The Cubs sell seats to individuals, to companies and to other groups and have food and drink available for sale on individual and group bases at many locations at Wrigley Field. The Cubs enhance the experience of live games at Wrigley Field by showing telecasts of the games at many points inside the ballpark.

19. The costs of fielding a Major League Baseball team are enormous. During the 2002 season, the Cubs spent nearly $80 million on the salaries of the players on its major league roster. The Cubs pay millions of additional dollars annually to operate and maintain Wrigley Field, incur the team's travel and road trip costs, and pay all of the other expenses of operating a team in Major League Baseball. The Cubs also bear the costs of operating a minor league system, with players, coaches, managers, scouts and other staff.

20. The Cubs sell the experience of viewing, in person and in the open air, Cubs baseball as it happens. Live Cubs baseball is a time sensitive product. Through Plaintiff's investments over the years and through its marketing efforts and nurturing of the team at Wrigley Field, Plaintiff has generated enormous goodwill and a dedicated following for Cubs games at Wrigley Field. There is no direct substitute for seeing the Cubs play on the Wrigley Field diamond in person while hearing the roar of the crowd.

21. The Cubs have a valuable property right in and to the live performance of Major League Baseball at Wrigley Field.

22. The Cubs own the copyrights in the local telecasts of each game, including each home game played at Wrigley Field that is carried on WGN-TV, WCIU-TV, CLTV and/or Fox Sports Net Chicago.

23. The Cubs have spent considerable sums advertising and promoting its inherently distinctive trade names and logos, including "The Chicago Cubs," the Cubs' logos, "Cubs baseball," and "Wrigley Field." Through the Cubs' investments and activities over the years, these trade names and logos have come to be associated with Plaintiff.

**B. <u>Defendants' Misappropriation Of The Cubs Property, Copyright Infringement And Deceptive Advertising.</u>**

24. Defendants take and sell the Cubs' property for Defendants' sole unjust economic gain, without license from the Cubs. On game days, they charge for admission to their rooftop and private party facilities, with the per person charge reaching as much as $150 or more. Some Defendants are charging up to $300 per person for games during the 2003 season. Fans cannot gain access to Defendants' rooftop and private party facilities unless the charge has been paid. In return for payment of the entry charge, Defendants provide their patrons with the ability to view Cubs games in person as they are played at Wrigley Field and to partake of food and

drink and also provide unauthorized performances of the Cubs' copyrighted telecasts, for the entertainment of patrons and to enhance their profits. Unlike bars and restaurants, Defendants' rooftop businesses operate only in conjunction with Cubs' home games. At all other times, they stand idle.

25. Defendants market their services and commercial activities by associating themselves with the Cubs and Wrigley Field, trading on the Chicago Cubs name, the Cubs' logo, Cubs' players, Wrigley Field and/or other words, symbols and pictures associated with Plaintiff. Defendants offer "bleacher" and "skybox" seats to view Cubs games, tout and depict the view of "Chicago Cubs baseball" and Wrigley Field from their facilities, and/or market the availability of Cubs' telecasts inside their establishments. Defendants' marketing efforts are, and have been, likely to cause confusion, to cause mistake or to deceive as to, *inter alia*, the affiliation, association or connection between Defendants and the Cubs and the Cubs' approval or sponsorship of Defendants' business activities. Defendants' marketing efforts have caused actual confusion among consumers, who are and have been led to believe mistakenly that Defendants' establishments are connected, associated or affiliated with, and endorsed or approved by, the Cubs.

26. Unlike Plaintiff, Defendants do not pay for the services of the Cubs' players; for a front office to run the operations of the club; for a minor league system to find and develop prospects; or for the other business activities and personnel required to operate a franchise in Major League Baseball. Unlike Plaintiff, Defendants do not incur any of the costs of maintaining a baseball park in which to play games or the cost of the necessary equipment. Unlike Plaintiff, Defendants do not pay the travel or any of the other costs required to play a full schedule of Major League Baseball games.

27. Defendants are unlawful free riders on the Cubs' investment. Defendants have acted, and are acting, in concert to unfairly misappropriate Plaintiff's property. Defendants formed, and are members of, an organization whose sole purpose is to perpetuate their ongoing theft of Plaintiff's product, thereby advancing the business interests of Defendants to the detriment of Plaintiff. Defendants make millions of dollars annually in direct competition with Plaintiff, all without incurring the costs required to produce the Cubs' product and without paying anything to the Cubs.

C. **<u>Defendants' Unlawful Conduct Has Injured the Cubs.</u>**

28. Defendants are in direct competition with the Cubs for the revenues Defendants receive. Like the Cubs, Defendants advertise and sell luxury skybox and other seating for business and other group affairs. Like the Cubs, Defendants advertise and sell bleacher seating to see games live. Like the Cubs, Defendants offer food, drink and other concessions. Like the Cubs, Defendants supplement and enhance the live game experience by providing performances of telecasts of the Cubs games. Defendants are thus able to improve and expand the useable area of their facilities, provide a place for fans to comfortably watch Cubs games during inclement weather, and increase their revenues and their profits. Like the Cubs, most Defendants market their businesses by featuring words, pictures and other symbols of the Cubs, Cubs baseball and Wrigley Field. These Defendants thereby advance their competitive business interests by associating themselves with Plaintiff.

29. At least a major part of the revenue obtained by Defendants from these activities is revenue that would otherwise flow to the Cubs. Many fans attend Cubs home games because they want to see the Cubs play at Wrigley Field, regardless of the Cubs' opponent. If

tickets to one game are sold out, fans may opt to purchase tickets to a different game. Where admission to Defendants' facilities is available, fans may go there instead of into the ballpark.

30. Revenues from the sale of tickets and concessions to the fans who come to Wrigley Field for live baseball are a major source of revenue for the Cubs. The Cubs sell tickets for bleacher, grandstand, box and skybox seating. In the skyboxes and in the concourses, telecasts of the games are provided to further enhance the experience and revenues. The Cubs sell food, drink and other concessions to fans at the park. Defendants' misappropriation of the Cubs' property in its live games and copyrighted telecasts diverts gate, concession and other receipts to Defendants. The revenues from Cubs game packages sold by Defendants to businesses, other groups or individuals are revenues that are lost to the Cubs. Defendants' efforts to associate themselves with the Cubs aid them in their unlawful efforts to compete with the Cubs for revenues.

**COUNT I:**
**VIOLATION OF THE COPYRIGHT ACT 17 U.S.C. §§ 101, *ET SEQ.***
**(As to defendants Skybox on Waveland, L.L.C.; Quoin, Ltd.; Beyond the Ivy, Inc.; Murphy's Rooftop Company; Brixen Ivy, L.L.C.; T. Lamb, Inc.; Aidan, Inc.; Tailgators on Northwest Highway, Inc.; and 3639 L.L.C., only)**

31. Plaintiff repeats and realleges paragraphs 1 through 30 of its Third Amended Complaint as if fully set forth herein.

32. Plaintiff telecasts each of its home games live. Simultaneously with the transmission of each such telecast, a recording of the telecast is made. Certain aspects of the telecasts, such as replays, player interviews, and segments from prior games are recorded prior to transmission. The telecasts of Cubs games are original works of authorship that constitute copyrightable subject matter under the laws of the United States. Plaintiff has complied with all formalities required to secure a copyright pursuant to the Copyright Act. Plaintiff owns the

copyright in each telecast of its games over WGN-TV, WCIU-TV, CLTV or Fox Sports Net Chicago.

33. Plaintiff received a Certificate of Registration from the Register of Copyrights for the copyrighted telecasts of its home games played on the following dates in 2002: June 1, 2, 14, 16, 18-21, 24-27; July 12-16, 19, 21-25, 30-31; August 1-4, 12-16, 18, 30-31; September 1-4, 10-11 and 24-29.

34. Plaintiff has submitted an application to the Register of Copyrights for a Certificate of Registration, along with the mandatory deposits and fees required for such registration, for the copyrighted telecasts of its home games played on the following dates in 2003: April 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 22, 23, 24; May 2, 3, 4, 5, 6, 7, 9, 10, 26, 27, 28, 30, 31; June 1, 3, 4, 5, 6, 21, 22, 25, 26; July 4, 6, 7, 8, 9, 10, 11, 23, 24, 29, 30, 31; August 1, 3, 11, 12, 13, 14, 15, 17, 29, 30, 31; September 1, 2 (Games 1 and 2), 3, 4, 12, 13, 14, 15, 16, 17, 27 (Games 1 and 2).

35. Plaintiff is, and at all relevant times has been, the legal and beneficial owner of all copyrights in the Cubs telecasts identified in paragraphs 33 and 34, above.

36. The following copyright notice is properly affixed to each of the Cubs telecasts identified in paragraph 33, above: "Copyright 2002 Chicago National League Ball Club, Inc."

37. The following copyright notice is properly affixed to each of the Cubs telecasts identified in paragraph 34, above: "Copyright 2003 Chicago National League Ball Club, Inc."

38. Defendants infringed Plaintiff's exclusive copyrights in the Cubs telecasts identified in paragraphs 33 and 34, above, by giving unauthorized public performances of the

telecasts on Defendants' premises for the entertainment of Defendants' patrons and for the enhancement of Defendants' businesses, revenues and profits. Plaintiff did not grant Defendants permission for these performances. Unless enjoined, Defendants likely will continue their infringing performances of the Cubs copyrighted telecasts.

39. On April 2, 2003, before opening day for the 2003 baseball season, counsel for the Cubs provided an Advance Notice of Potential Infringement pursuant to § 411(b) of the Copyright Act to each defendant, stating that infringement of the Cubs' copyrights by any defendant would subject each defendant to liability for copyright infringement, and that the Cubs would seek relief for the copyright infringement to the fullest extent provided by law, including injunctive relief, damages, profits, costs and attorneys' fees.

40. Defendants' infringement of Plaintiff's protected copyrights has been intentional and willful.

41. Plaintiff has been injured and is continuing to be injured by Defendants' infringement of its copyrighted telecasts.

**COUNT II:**
**VIOLATION OF THE LANHAM ACT § 43(A), 15 U.S.C. § 1125(A)**

42. Plaintiff repeats and realleges paragraphs 1 through 41 of its Third Amended Complaint as if fully set forth herein.

43. Plaintiff's trade names and logos, including "the Chicago Cubs," the Cubs logos, "Cubs baseball," and "Wrigley Field" are inherently distinctive, have acquired a secondary meaning among consumers and have come to be associated with Plaintiff. Plaintiff uses its trade names and logos, *inter alia*, in advertisements promoting ticket sales in interstate commerce.

44. The words and symbols used by Defendants in their marketing and other activities are, and have been, likely to cause confusion as to the affiliation, connection or association of Defendants with the Cubs and the Cubs' approval or sponsorship of Defendants' business activities. Defendants' marketing efforts have caused actual confusion among consumers. Defendants' activities in this regard are undertaken in connection with the sale of goods and services in interstate commerce, and Defendants' activities adversely affect, *inter alia*, Plaintiff's ticket sales in interstate commerce.

45. Plaintiff has been and will continue to be injured by Defendants' misleading advertising.

**COUNT III:**
**MISAPPROPRIATION**

46. Plaintiff repeats and reallages paragraphs 1 through 45 of its Third Amended Complaint as if fully set forth herein.

47. Plaintiff spends millions of dollars annually to produce baseball games at Wrigley Field, including money spent on, among other things, the salaries of the Cubs' players, the operations and maintenance of Wrigley Field and the presentation of games live at the ballpark. Plaintiff has a property right in and to the performance of the Major League Baseball games played by the Cubs at Wrigley Field.

48. Defendants sell to the public performances of Cubs baseball played at Wrigley Field. Defendants are in direct competition with the Cubs for revenues flowing from live Cubs baseball, and their unlawful competitive activities have deprived the Cubs of millions of dollars in revenue. In so doing, Defendants have pocketed millions of dollars in profits.

49. Defendants do not pay any of the costs incurred by the Cubs to field a team and play baseball games at Wrigley Field, nor do they pay the Cubs a licensing fee for the

right to sell tickets to watch Cubs games. Instead, Defendants free-ride off the Cubs' expenditures and investments, paying the Cubs nothing.

50. Plaintiff has been injured as a result of Defendants' unlawful and inequitable conduct.

**COUNT IV:**
**UNJUST ENRICHMENT**

51. Plaintiff repeats and reallages paragraphs 1 through 50 of its Third Amended Complaint as if fully set forth herein.

52. Defendants operate extremely profitable businesses because they take the Cubs' property and divert the Cubs' revenues to themselves without paying any of the costs required to, among other things, field a team and operate a ballpark in order to participate in Major League Baseball.

53. By unlawfully taking the Cubs' property and using it as the essential part of their multimillion dollar businesses, Defendants obtain a windfall and are unjustly enriched.

54. Plaintiff has been injured as a result of Defendants' unlawful and inequitable conduct.

WHEREFORE, the Cubs pray for:

1. compensatory damages;

2. statutory damages for the year 2003 pursuant to 17 U.S.C. § 504(c);

2. disgorgement to Plaintiff of Defendants' profits;

3. treble damages pursuant to 15 U.S.C. § 1117(a);

4. a permanent injunction barring Defendants from (a) selling, or in any way offering for value, admissions to view live baseball games played at Wrigley Field without license from the Cubs; (b) infringing Plaintiff's copyrights; and (c) engaging in any commercial advertising, promotion or marketing likely to cause confusion, mistake or deception concerning Defendants' connection or affiliation with the Cubs or the Cubs' sponsorship or approval of Defendants' businesses;

5. an award granting Plaintiff its costs and reasonable attorneys' fees; and

6. such other relief as the Court may award.

Dated: October 11, 2003

Respectfully submitted,

CHICAGO NATIONAL LEAGUE
BASEBALL CLUB, INC.

By: [signature]
One of Its Attorneys

John R. McCambridge
Gary M. Miller
Paul A. Sheldon
Maile H. Solís
GRIPPO & ELDEN
227 West Monroe Street
Chicago, Illinois 60606
(312) 704-7700

**CERTIFICATE OF SERVICE**

I, Maile H. Solís, an attorney, hereby certify that on **October 27, 2003,** I caused a true and complete copy of the foregoing **THIRD AMENDED COMPLAINT FOR INJUNCTION, DAMAGES AND OTHER RELIEF** to be served via Messenger Delivery upon the following:

Chris C. Gair
Kristi L. Nelson
Freeman Freeman & Salzman, P.C.
401 North Michigan Avenue
Suite 3200
Chicago, Illinois 60611-4207

Michael H. Baniak
Charles C. Valauskas
Baniak Pine and Gannon
150 North Wacker Drive
Suite 1200
Chicago, Illinois 60606

Maile H. Solís

# AGREEMENT

This Agreement (the "Agreement") is made and entered into as of this 27th day of January, 2004 (the "Effective Date"), by and between Chicago National League Ball Club, Inc., a Delaware corporation located at 1060 W. Addison Street, Chicago, Illinois, 60657 (the "Cubs"), and separately with each entity listed in Exhibit A hereto (the "Rooftops").

## WITNESSETH

WHEREAS, the Cubs filed a civil lawsuit against the Rooftops, entitled Chicago National League Ball Club, Inc., v. Skybox on Waveland, et al., No. 02 C 9105, in the United States District Court for the Northern District of Illinois (the **"Action"**), alleging copyright infringement, violation of the Lanham Act, misappropriation and unjust enrichment; and

WHEREAS, the Rooftops deny all claims in the Action and assert they are operating their businesses lawfully; and

WHEREAS, the parties wish to avoid the expense and uncertainty of a trial; and

WHEREAS, the parties wish to compromise and settle the dispute and to resolve all the claims that were or could have been brought in the above-captioned lawsuit without any admission of fault or determination as to the merits of the lawsuit.

NOW, THEREFORE, for and in consideration of the agreements, covenants and conditions herein, and for good and valuable consideration the sufficiency and receipt of which are expressly acknowledged, the Cubs and Rooftops (collectively, the **"Parties"**), agree as follows:

1. ***Definitions.*** The terms used in this Agreement will have the meaning in Exhibit C.

2. ***Dismissal of Action.*** Within three business days of execution of this ~~Agreement, the Cubs~~ shall dismiss each Rooftop defendant that executes this Agreement from the Action with prejudice ~~and~~ withdraw all pending motions or matters related to any such Rooftop. The parties understand the Action will continue against other defendants named in the Action who have not ~~executed this~~ Agreement. The Parties reserve all rights not specifically granted in this Agreement.

3. ***Payment obligations.***

3.1 **Royalty.**

a) Each Rooftop shall pay the Cubs, on an annual basis, an amount equal to 17% of its Gross Revenues and 11% of its Billboard Revenues, if any (together, the "Royalty").

b) The Parties agree Rooftops are currently prohibited from displaying Billboards under City of Chicago law. Nothing in this Agreement will preclude the Cubs from opposing any change to the current law, including the placement of Billboards or any other advertising visible from inside Wrigley Field on any of the buildings in the Wrigley Field Adjacent Area.

EXHIBIT 2

[redacted]

c) Payment of the Royalty shall be an independent obligation of each Rooftop and, except as provided in Section 6 hereof, shall not be reduced, offset or otherwise altered for any reason.

d) The Cubs recognize that attendance at Rooftops includes a number of groups and individuals who do not pay the Rooftop (in money, goods or services) and from which no Royalty payment will be due. The Rooftop shall provide on the Royalty Statement the name of each such non-paying group (15 guests or more) receiving complimentary use of the rooftop, the date of such use and the number of attendees.

e) The Cubs recognize that attendance at Rooftops includes fundraisers to support various organizations or groups who do not pay the Rooftop (in money, goods or services) and from which no Royalty payment will be due. The Rooftop shall provide on the Royalty Statement the name of each organization or group receiving complimentary use of the rooftop for a fundraiser or otherwise, the date of such use and the number of attendees.

f) The Cubs recognize that Rooftops receive referrals from third parties that have no relationship with their Rooftop (such as an independent event or party planner). Fees, if any, paid by customers directly to such third parties from which Rooftop receives no payment, rebate or consideration from the third party are not subject to a Royalty payment.

3.2 **Royalty due date.** The Royalty shall be paid to the Cubs on or before December 15th of each calendar year for the preceding baseball season. In addition to the Royalty payment, each Rooftop shall provide the Cubs with a written statement (the **"Royalty Statement"**), on a form to be agreed to by the parties showing: (i) attendance for the Rooftop for each regular season and postseason Game; (ii) Gross Revenues for the season; (iii) the name of each non-paying group or organization receiving complimentary use of the Rooftop, the date of such use and the number of attendees; and (iv) Billboard Revenues, if any. The Royalty Statement shall be executed in good faith by the person principally responsible for operating the Business and by one of the Rooftop owners.

3.3 **Periodic statements.** On or before each of April 15, July 15 and October 15, each Rooftop shall provide the Cubs with a good faith estimate of the Gross Revenues and Billboard Revenues, if any, received by Rooftop for the calendar year through, respectively, March 31, June 30 and September 30. Each such estimate shall be executed in good faith by the person principally responsible for operating the Business and by one of the Rooftop owners.

3.4 **Audit.**

a. **Books and Records.** Each Rooftop will maintain complete and accurate books and records regarding its Gross Revenues and Billboard Revenues, if any, (the **"Records"**). Each Rooftop will retain its Records for at least 18 months following the close of the calendar year to which the Record pertains. The Cubs and rooftops shall select, within 30 days of the Effective Date, an independent auditor ("Auditor") from among the firms of Deloitte & Touche, Ernst & Young, KPMG, Grant Thornton, or such other firm as the parties agree, to serve as the Auditor under this

Agreement. Auditor shall, when requested to do so by the Cubs and at the Cubs' cost, examine, audit, copy and verify the Records, during normal business hours at any time (no more than once each calendar year per Rooftop), for the purpose of ascertaining Rooftop Gross Revenues and Billboard Revenues, if any, for the prior calendar year. Rooftops will supply any information reasonably requested by the auditor for this purpose within 30 days of request. Except as required to disclose discrepancies discovered in the audit, the Auditor shall keep all information disclosed in the audit confidential, including all customer lists. The Auditor shall serve for 5 years from the date of his selection, at which time he may be terminated at the request of either Party and, while completing any outstanding audit, be replaced with a new Auditor chosen by the Parties within 30 days from among the same (or similar) firms as listed above. The Auditor selected shall not at any time have a business relationship, unless disclosed and the conflict is waived in writing, with any of the parties bound by this Agreement other than that as a customer who attends a Cubs game or Rooftop. The Cubs shall have 90 days from the receipt of the Royalty Payment and Royalty Statement to elect whether or not they wish to conduct an audit for that period. In the event the Cubs do not elect to conduct an audit within the 90 day period, the Royalty Payment and Royalty Statement shall be deemed accepted as accurate.

b. **Adjustments.** At the conclusion of its audit, the Auditor shall prepare a written report. In the event the audit shows an underpayment of Royalties, Rooftop shall pay the underage to Cubs within 15 days of such determination. In the event of an overpayment, the overage shall be refunded to the Rooftop or credited to the following season's royalty at the option of the Rooftops. In the event the audit shows an underpayment of Royalties of 10% or more, Rooftop shall pay, within 15 days of such determination: (i) the underpayment; (ii) 50% of the cost of the Cubs portion of the audit, and (iii) the Penalty described in Section 3.5 below.

3.5 **Penalty.** In the event an audit of a Rooftop shows an underpayment of 10% or more of any Royalty, the Rooftop shall pay Cubs a Penalty equal to a multiple of such underpayment as follows: in the first instance of underpayment, 50% of such underpayment; in the second instance of underpayment by the same Rooftop, 100% of such underpayment; in the third instance of underpayment by the same Rooftop, 150% of such underpayment; and in any subsequent instance of underpayment by the same Rooftop, an additional 50% of the underpayment.

3.6 The Rooftops may request at any time and at their own expense an internal preliminary audit by the Auditor to assist Rooftops in developing procedures or practices to comply with the provisions of this Agreement. This internal preliminary audit is solely for the use of the Rooftops and is not subject to the provisions of 3.4 and 3.5 of this Agreement.

4. ***Term and termination.***

4.1 This Agreement will commence on the Effective Date and expire December 31, 2023 (the "**Term**"), unless earlier terminated as provided herein.

4.2 Expiration of this agreement at the end of its 20 year term shall be without prejudice to any Rooftop's ability to assert no license or permission from the Cubs is required for the right to sell admission to view Games from a Rooftop and without prejudice to the Cubs'

ability to assert a license or other permission from the Cubs is required for the right to sell admission to view Games from the Rooftops.

4.3 The Cubs may terminate the Agreement as to any individual Rooftop in the event of the following:

a. in the event such Rooftop fails to pay any undisputed royalty payment required under this Agreement, plus interest (computed according to the formula in 28 U.S.C. § 1961), within 90 days of the date due.

b. in the event an independent audit as set forth in Section 3.4 above finds an underpayment of more than 10% in the Royalty payment from that Rooftop three times in any five consecutive calendar years.

c. in the event such Rooftop is no longer viable as a business following expansion of the Wrigley Field bleachers pursuant to Section 6.2 below.

4.4 Notwithstanding Section 4.2 above, in the event of termination for any reason set forth in Section 4.3, no terminated Rooftop may thereafter engage in the sale of admission to view Cubs games or collect any other compensation or benefit related to activity on a rooftop on the day of a Game through December 31, 2023, provided, however, that such Rooftop may receive Billboard Revenue and, if it does, pay 11% to the Cubs as provided in Section 3, above.

5. ***Transfer.***

5.1 **Transfer or assignment.** Each Rooftop may, by operation of law, sale, merger, reorganization or otherwise, transfer or assign any of its rights or delegate any of its obligations under this Agreement to any third party provided such third party agrees to accept all the Rooftop's rights and obligations under this Agreement. In addition, each Rooftop shall have the right and obligation to operate any new rooftop facility under the terms of this Agreement, except that the provisions of ¶¶ 6.1-6.4 shall not apply to any such new facility.

5.2 **Successors.** This Agreement shall bind the Cubs, each Rooftop, and their respective parent companies, subsidiaries and affiliates, and each employee, successor, assign, heir, administrator and executor of any of the foregoing.

5.3 The Rooftops agree that it is not their intent and they will not make transfers of payment or ownership for the purpose of trying to defeat any payment obligations they have under the Agreement.

6. ***Wrigley Field bleacher expansion.***

6.1 If the Cubs expand the Wrigley Field bleacher seating and such expansion so impairs the view from any Rooftop into Wrigley Field such that the Rooftop's business is no longer viable unless it increases the height of its available seating, then such Rooftop may in its discretion elect to undertake construction to raise the height of its seating to allow views into Wrigley Field and the Cubs shall reimburse the Rooftop for 17% of the actual cost of such construction.

6.2 If the Cubs expand the Wrigley Field bleacher seating and such expansion so impairs the view from any Rooftop into Wrigley Field such that the Rooftop's business is no longer viable even if it were to increase its available seating to the maximum height permitted by law, and if such bleacher expansion is completed within eight years from the Effective Date, then if such Rooftop elects to cease operations before the beginning of the next baseball season following completion of such expansion, the Cubs shall reimburse that Rooftop for 50% of the royalties paid by that Rooftop to the Cubs during the time between the Effective Date and the date of expansion of the Wrigley Field bleachers. The Cubs shall pay such reimbursement to the Rooftop within 30 days of receiving notice from the Rooftop it is no longer viable and has ceased operations. Any Rooftop receiving payment from the Cubs pursuant to this provision shall cease operations for the remainder of the Term and shall not seek or accept any compensation or benefit related to activity on a Rooftop on a day of a Game.

6.3 In the event of a dispute between the Cubs and any Rooftop regarding whether such Rooftop remains viable pursuant to Section 6.1 or 6.2 or whether (or to what extent) construction of new seating is required pursuant to Section 6.1, either Party may request such dispute be resolved pursuant to binding arbitration between the Parties pursuant to Section 9 below.

6.4 If the Cubs expand the Wrigley Field bleacher seating and such expansion impairs the view from any Rooftop into Wrigley Field such that the Rooftop's Gross Revenue in the year of expansion is more than 10% below the average Gross Revenue for that Rooftop in the two years prior to expansion (normalizing for number of Games played, rain-outs and doubleheaders, playoff games, work stoppage, replacement players, and the like), then the affected Rooftop can seek a reduction in the Royalty rate for all subsequent years of the Term. Upon such request, the parties shall meet and negotiate in good faith a new Royalty. If the Parties cannot agree, then the Rooftop may submit the issue of its appropriate Royalty rate to binding arbitration pursuant to Section 9.

a. In the event any Royalty is reduced pursuant to this Section 6.3, the Cubs may seek to raise or restore the Royalty at a later date (e.g., in the event the Rooftop subsequently builds higher or the Rooftop's drop in business proves temporary). Such revision may be negotiated between the Parties or submitted to arbitration. Notwithstanding the foregoing, in no event may the Royalty exceed 17%.

6.5 Nothing in this Agreement limits the Cubs' right to seek approval of the right to expand Wrigley Field or the Rooftops' right to oppose any request for expansion of Wrigley Field.

6.6 The Cubs shall not erect windscreens or other barriers to obstruct the views of the Rooftops, provided however that temporary items such as banners, flags, and decorations for special occasions, shall not be considered as having been erected to obstruct views of the Rooftops. Any expansion of Wrigley Field approved by governmental authorities shall not be a violation of this Agreement, including this section.

7. ***Marketing***. At the request of the Rooftops, acting jointly with other rooftops that have executed this Agreement, the Cubs agree to reasonable participation in marketing efforts to promote the sale of Rooftop products or services for which the Cubs are paid the Royalty set forth above. Such efforts shall be as agreed by the Parties and shall include (without limitation) the following:

7.1 WGN-TV will show and comment upon the Rooftops' facilities during broadcasts of Cubs games and the Cubs will request other Cubs television broadcasting partners to do the same. If, however, there is a Billboard or other advertising on a Rooftop, WGN will not be required to show that Rooftop or comment on it and Cubs may request others not to show or comment.

7.2 Each Rooftop shall have a license during the Term to use the Cubs' Marks identified in Exhibit B solely for the purpose of marketing and promoting the sale of admissions to its Rooftop. The Cubs will not object to the Rooftops' use, solely for the same purpose, of the term "Wrigley Field". Each use of the Cubs Marks must include a trademark notice of registration or protection as shown on Exhibit B. The Cubs may revise Exhibit B from time to time in their discretion. Rooftops may not use Cubs' Marks on merchandise, apparel, Billboard or to promote the sale of any other product or service.

7.3 From time to time during each season, the Cubs shall authorize WGN-TV or other Cubs broadcasting partner(s) to identify a phone number where fans can call to reserve Rooftop seating. Such phone number will be provided to Cubs by the Rooftops jointly. The Rooftops shall determine how calls to that phone number will be apportioned among the various Rooftop businesses.

7.4 The Rooftops shall have the right to inform the public that they are endorsed by the Cubs.

7.5 The Cubs director of marketing shall meet with Rooftops before the start of each Major League Baseball season to discuss opportunities for joint marketing.

7.6 The Cubs shall include a discussion about the Rooftops on their tour of Wrigley Field and shall include stories positive about the Rooftops in *The Vine Line*.

7.7 Each of the Rooftops may display broadcasts of Cubs games to patrons at its facility, including displaying such broadcasts on multiple television sets, without any infringement of any copyright owned by the Cubs or its assignees.

8. *Non-disparagement.*

8.1 Each Rooftop agrees that it will not publicly disparage, abuse, or insult the business of the Cubs or the moral character of the Cubs or any of its employees.

8.2 The Cubs will not publicly disparage, abuse or insult the business of any Rooftop or the moral character of any Rooftop or any Rooftop employee.

9. ***Arbitration.*** All disputes arising under this Agreement shall be arbitrated according to the rules of the American Arbitration Association (or such other organization as the parties agree upon), except as noted in this Section.

9.1 The arbitrators shall be chosen as follows: each of the Cubs and the Rooftop shall nominate three individuals to serve as arbitrator. None of these persons may be an employee of the Cubs or any Rooftop nor have any financial interest in the Cubs or any Rooftop. The affected Rooftop will then choose one of the three individuals nominated by the Cubs and the Cubs will choose one of the three individuals nominated by the Rooftop. The two individuals selected as arbitrators will then meet and choose a third arbitrator to complete the panel, which third arbitrator must be an independent, third

party with no relationship to or interest in (including without limitation any related or unrelated financial or business relationship) the Cubs or any Rooftop. If the arbitrators cannot agree on a third arbitrator, then each Party's arbitrator shall nominate one independent, third party who shall have no relationship to or interest in (including without limitation any related or unrelated financial or business relationship) the Cubs or any Rooftop and who is not a current or former elected official or employee of the City of Chicago or any organization or entity who has received money from the Cubs or any Rooftop. The third arbitrator shall be chosen by lot from among those two individuals.

9.2 In the event more than one Rooftop is involved in a similar dispute related to this Agreement, the Parties may agree, but are not required to, arbitrate such dispute collectively. In such event, the affected Rooftops will agree on arbitrators pursuant to Section 9.2 and collectively submit one set of choices to the Cubs.

9.3 Each Arbitration decision shall be binding on the Parties to that Arbitration and, unless the Cubs and all Rooftops agree in advance of the decision, shall be binding vis-à-vis each other only.

9.4 The losing party in the Arbitration shall bear the costs and fees of the Arbitration as well as the costs and fees of the prevailing party.

10. *Warranties; Indemnification.*

10.1 Each Party represents and warrants it has the authority to enter into this Agreement and perform all obligations hereunder, and that it will obtain any and all licenses required and other approvals required to operate under this Agreement., Each party is solely responsible for the actions and activity of its own business.

10.2 The Cubs hereby indemnify and will defend and hold harmless each Rooftop, its parent and affiliated companies, subsidiaries and each of their officers, directors and employees against every claim, action, suit, loss, damages, liability, settlement cost or expense of any kind including attorneys fees and court costs occasioned by or relating to (i) any tort that may occur to someone in Wrigley Field or resulting from conduct by someone in Wrigley Field, provided that this indemnity would not apply if any tort was occasioned by conduct by someone on a Rooftop, and (ii) any contract entered into by the Cubs to which a Rooftop is not a party.

10.3 The Rooftops hereby indemnify and will defend and hold harmless the Cubs, its parent and affiliated companies, subsidiaries and each of their officers, directors and employees against every claim, action, suit, loss, damages, liability, settlement cost or expense of any kind including attorneys fees and court costs occasioned by or relating to (i) any tort that may occur to someone on a Rooftop or resulting from conduct by someone on a Rooftop, provided that this indemnity would not apply if any tort was occasioned by conduct by someone in Wrigley Field, and (ii) any contract entered into by a Rooftop to which the Cubs is not a party.

11. *Releases.*

11.1 *Release of Cubs.* Each Rooftop, on behalf of itself, its parent companies, subsidiaries and affiliates, and all individuals holding any ownership interest in any of the foregoing, all entities under common ownership with any of the foregoing, and each employee,

successor, assign, heir, administrator, attorney, and executor of any of the foregoing, hereby release the Chicago National League Ball Club, Inc., its parent companies, directors, officers, representatives, predecessors, successors, assigns and attorneys from any claim, loss, damage, harm or cause of action relating in any way to the operation of a Rooftop business from the beginning of time until the execution of this agreement, including but not limited to, all claims which are unasserted or unknown at the execution of the agreement.

11.2 ***Release of Rooftops.*** The Chicago National League Ball Club, Inc., its parent companies, directors, officers, representatives, predecessors, successors, and assigns hereby release each Rooftop, its parent companies, subsidiaries and affiliates, and all individuals holding any ownership interest in any of the foregoing, all entities under common ownership with any of the foregoing, and each employee, successor, assign, heir, administrator, attorney and executor of any of the foregoing, from any claim, loss, damage, harm or cause of action relating in any way to the operation of a Rooftop business from the beginning of time until the execution of this Agreement, including but not limited to, all claims which are unasserted or unknown at the execution of the agreement.

12. ***Entire agreement.*** This Agreement constitutes the entire understanding of the Parties concerning the subject matter hereof and supersedes and cancels all prior or contemporaneous oral or written communications, agreements or understandings between the Parties or their predecessors. This Agreement may be modified only by a writing signed by the duly authorized representatives of the affected Party(ies).

13. ***Waiver.*** Failure of a Party to insist upon or enforce strict performance of any provision of this Agreement or failure, delay or omission in exercising any right with respect to any term of this Agreement, will not be construed as a waiver or relinquishment to any extent of a Party's right to assert or rely upon any such provision or right in that or any other instance.

14. ***Remedies.*** Except where otherwise specified, the rights and remedies granted to a Party under this Agreement are cumulative and in addition to, and not in lieu of, any other rights or remedies which the Party may possess at law or in equity.

15. ***Governing Law.*** This Agreement will be governed by and construed and interpreted, as if written jointly by the Parties, in accordance with the laws of the State of Illinois, without giving effect to the conflict of law principles thereof.

16. ***Notice:*** Notices to the Cubs will be sent to the address shown above for the Cubs with a copy to Office of the General Counsel, Chicago National League Ball Club, Inc., 435 N. Michigan Avenue, Chicago, IL, 60611, and notices to each Rooftop will be sent to the address shown on Schedule D with a copy to their attorney or representative as indicated.

17. ***Construction; Severability.*** In the event any provision of this Agreement conflicts with applicable law or is held invalid, illegal or unenforceable, such provision will be deemed to be restated to reflect as nearly as possible the original intentions of the Parties in accordance with applicable law and the remaining terms, provisions, covenants and restrictions of this Agreement will remain in full force and effect. Each provision hereof is intended to be severable and the validity, legality or enforceability of any provision of this Agreement will not affect the validity, legality or enforceability of the remainder of this Agreement.

18. ***Independent contracting parties.*** The Parties enter this Agreement as independent contracting parties. No Party will have the power to obligate or bind any other Party in any manner whatsoever. No Party will represent itself to others as an agent or joint venturer with any other Party.

19. ***Counterparts.*** This Agreement may be executed in counterparts, in which case each such counterpart will be deemed an original and collectively such counterparts will form the Agreement between the parties.

20. ***Headings.*** Section headings are for convenience only and will in no way affect the construction or interpretation of this Agreement.

21. ***Survival.*** Notwithstanding anything contained herein to the contrary, the following sections of this Agreement shall survive termination or expiration of the Agreement: Section 3.4 (Audit, which shall survive for 18 months), 4.4, 5 (transferability, restriction survives only as to termination and only until December 31, 2023), 10 (indemnification, which shall survive as to claims related to events occurring prior to termination or expiration of the Agreement), 11 (releases) and any other provision for which survival is equitable.

22. ***No admission or waiver.*** This Agreement does not constitute an admission by any Party of any liability of any kind. Each Party expressly denies it is in any way liable to any other Party.

[redacted]

IN WITNESS WHEREOF, the Parties hereto have caused their duly authorized representatives to execute this Agreement as of the date first above written.

CHICAGO NATIONAL LEAGUE BASEBALL CLUB, INC.

By: [signature]
Print Name: MARK E. McGUIRE

AIDAN, INC.:

By: [signature]
Print Name: AIDAN DUNICAN.

BRIXEN IVY, L.L.C.:

By: [signature]
Print Name: MARK SCHLENKER

QUOIN, LTD.:

By: [signature]
Print Name: TIM A. GRODRIAN

TAILGATORS ON NORTHWEST HIGHWAY, INC.:

By: [signature]
Print Name: JOSEPH R HAKACZ

3639 L.L.C.

By: [signature]
Print Name: James G. Loukas, Phillip Cheek memb

BEYOND THE IVY, INC.:

By: [signature]
Print Name: James W. Purcell

MURPHY'S ROOFTOP COMPANY:

By: [signature]
Print Name: ELIZABETH MURPHY

SHEFFIELD-WAVELAND ROOFTOPS, INC.:

By: [signature]
Print Name: GEORGE LOUKAS

## EXHIBIT A

**The "Rooftops"**

1. 3639 L.L.C., 3639 N. Sheffield Avenue, Chicago, Illinois 60613.

2. Aidan, Inc., 1050 W. Waveland Avenue, Chicago, Illinois 60613.

3. Beyond the Ivy, Inc. (i) 1008-1010 W. Waveland Avenue, Chicago, Illinois 60613; (ii) 1048 W. Waveland Avenue, Chicago, Illinois 60613.

4. Brixen Ivy, L.L.C., 1044 W. Waveland Avenue, Chicago, Illinois 60613.

5. Murphy's Rooftop Company, 3649 N. Sheffield Avenue, Chicago, Illinois 60613.

6. Quoin, Ltd., doing business as Skybox on Sheffield, 3627 N. Sheffield Avenue, Chicago, Illinois 60613.

7. Sheffield-Waveland Rooftops, Inc., (i) 1032-34 W. Waveland Avenue, Chicago, Illinois 60613; (ii) 3643-45 N. Sheffield Avenue, Chicago, Illinois 60613.

8. Tailgators on Northwest Highway, Inc. 3621-25 N. Sheffield Avenue, Chicago, Illinois 60613.

Note: as used in the Agreement, "Rooftop" shall mean each of the entities above, their parent companies, subsidiaries and affiliates, and each employee, successor, assign, heir, administrator and executor of any of the foregoing.

**EXHIBIT B**

**MARKS**

CUBS®
CHICAGO CUBS®
"C"®
"WALKING BEAR"®

**EXHIBIT C**

**Definitions**

**"Billboard"** means any advertisement legible from home plate in Wrigley Field, not currently permitted under City of Chicago law, and later erected as permitted by City of Chicago Municipal Code.

**"Billboard Revenue"** means any compensation and/or benefit received directly or indirectly by a Rooftop in connection with a Billboard, including without limitation compensation from any barter transactions.

**"Days"** as used in this Agreement, whether capitalized or lower case, means calendar days, not business days, unless otherwise specified.

**"Game"** shall mean, without limitation, any Major League baseball games, non-professional baseball games, National Football League games, non-professional football games, concerts or any other event taking place in Wrigley Field.

**"Gross Revenue"** means any compensation and/or benefit received by a Rooftop in connection with scheduled Game days, and related to the operation of the Premises, with no deductions for expenses. Billboard Revenue is excluded from Gross Revenue. Without limiting the foregoing, Gross Revenue includes any compensation related to individual or group ticket sales, provision of rooftop, balcony or other seating to view into Wrigley Field, provision of party rooms, bars, media centers, television monitors for viewing of the games, barter transactions, membership fees, dues, rental fees, surcharges, packages, concessions, food, beverages, souvenirs, marketing fees, sponsorship fees, advertising fees, product placement fees and any other products or services offered by, on behalf of or through a Rooftop. For the avoidance of doubt, in the event a Rooftop refunds any portion of Revenue to a customer in the event of a rainout, cancellation or other reason, then the amount actually refunded to the customer shall be excluded from the definition of Revenue. For the avoidance of doubt, any compensation and/or benefit received directly or indirectly by a rooftop in connection with any advertising other than Billboard Revenue shall be included as part of Gross Revenue. For the avoidance of doubt, Gross Revenue to a Rooftop shall not include payments to that Rooftop by an unrelated Rooftop for services provided (e.g., catering services), provided such services are not related to the operation of the Premises of the Rooftop providing the service. For the avoidance of doubt, Gross Revenue shall not include funds received pursuant to a sale of the Rooftop business or real estate wherein the Rooftop is located. For the avoidance of doubt, Gross Revenue shall not include funds received pursuant to a lease, of one year or more, of the Rooftop business to an operator who is bound by this Agreement.

**"Marks"** means the trademarks listed in Exhibit B.

**"Premises"** means, for each physical location identified in Exhibit A and the physical location of each new rooftop facility operated by a Rooftop pursuant to ¶ 5.1 of this Agreement, any portion of the building, the operation of which is (or is required to be) licensed by the City of Chicago under the Rooftop's Special Club License (as defined in Section 4-388-010(c) of the City of Chicago Municipal Code).

**"Revenue"** means Gross Revenue and Billboard Revenue.

**"Rooftop"** has the meaning stated in Exhibit A.