**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CHICAGO CUBS BASEBALL CLUB, LLC, | ) | |
| Plaintiff, | ) | Case No. 24-cv-05086 |
| v. | ) | |
| | ) | Judge Sharon Johnson Coleman |
| AIDAN DUNICAN and ROOFTOP BY THE FIREHOUSE, INC., | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Chicago Cubs Baseball Club, LLC ("Plaintiff") filed suit against Defendants Aidan Dunican ("Dunican") and his business Rooftop by the Firehouse, Inc. d/b/a Wrigley View Rooftop ("Wrigley View" and, together with Dunican, "Defendants"), alleging that they engaged in misappropriation, unjust enrichment, and violations of the Lanham Act, 15 U.S.C. §§ 1051, *et seq.* Plaintiff alleges that Defendants profited from their rooftop view of the Chicago Cubs baseball games and continued to use Plaintiff's trademarks without authorization. Before the Court are Plaintiff's Motion for Summary Judgment and a Permanent Injunction [96], Defendants' Motion to Strike Plaintiff's Statement of Material Facts and for Entry of an Order Denying Plaintiff's Motion for Summary Judgment (the "Motion to Strike") [142], and Defendants' Motion for Summary Judgment [155]. For the reasons set forth below, the Court denies Defendants' Motion to Strike, grants in part and denies in part Plaintiff's Motion for Summary Judgment and a Permanent Injunction, and grants in part and denies in part Defendants' Motion for Summary Judgment.

## BACKGROUND

### I. Local Rule 56.1

#### a. Defendants' Motion to Strike

As an initial matter, the Court addresses Defendants' Motion to Strike. Defendants object to Plaintiff's statement of material facts on the basis that it violates Local Rule ("L.R.") 56.1 by including "multiple purportedly material facts into lengthy, subject-matter narratives" in numbered paragraphs.

L.R. 56.1(a)(2) requires a party moving for summary judgment to file a statement of material facts with citations to the record and attach the cited evidence. The Court finds that Plaintiff's statement of material facts largely adheres to the requirements of L.R. 56.1. L.R. 56(d)(1) provides that each statement of material fact "must consist of concise numbered paragraphs." The rule does not require each statement of material fact to be limited to one discrete fact or a single sentence. *Molina v. Latronico*, 2024 WL 1376500, at *2 (N.D. Ill. Mar. 31, 2024) (Valderrama, J.); *see also Banks v. Illinois Central Railroad Company*, 2019 WL 3080923, at *3 (N.D. Ill. July 15, 2019) (Blakey, J.) ("Nothing in Rule 56.1 instructs parties to include only one fact per paragraph.")

The Court agrees with others in this District that "[w]hile Local Rule 56.1 requires conciseness, '[a] statement of material facts that presents one fact at a time per paragraph would not be an efficient manner in which to present a statement of material facts and would not be consistent with Local Rule 56.1.'" *Venticinque v. City of Chicago*, 2025 WL 92536, at *1 (N.D. Ill. Jan. 13, 2025) (Ellis, J.) (internal citation omitted). Additionally, the facts Plaintiff includes in the same numbered paragraphs are closely interrelated and presenting them together is not "more confusing than efficient." *See id.*

Accordingly, the Court denies Defendants' Motion to Strike and proceeds to the parties' Motions for Summary Judgment.

*A. Evidentiary Objections*

At the summary judgment stage, the Court "may consider any material that would be admissible or usable at trial, including properly authenticated and admissible documents or exhibits." *Smith v. City of Chicago*, 242 F.3d 737, 741 (7th Cir. 2001) (citations and quotations omitted)); *Woods v. City of Chicago*, 234 F.3d 979, 988 (7th Cir. 2000) (noting that court may consider "properly authenticated and admissible documents or exhibits" in evaluating a motion for summary judgment).

The Court need not list each instance of deficiency in the parties' LR 56.1 statements, but notes that it will rely on the parties' facts only to the extent that they are supported by the record and comply with LR 56.1. *See Johnson v. Accenture LLP,* 142 F.4th 536, 542 (7th Cir. 2025) (finding that "presenting several assertions without appropriate citation and by offering facts that were either legal conclusions or irrelevant" violates L.R. 56.1).

. Defendants object to certain webpages Plaintiff attaches to its L.R. 56.1 statement of facts on the basis that the webpages are unauthenticated inadmissible hearsay. The Court will only consider evidence that is (1) authenticated and (2) excluded from the definition of hearsay and/or falls within an exception to the rule against inadmissible hearsay.

## II. Undisputed Facts

The following facts are drawn from the parties' L.R. 56.1 statements and supporting record.

*a. The Chicago Cubs*

Plaintiff owns and operates the Chicago Cubs (the "Cubs"), a Major League Baseball ("MLB") team. The team plays at Wrigley Field, a historic open-air ballpark. Plaintiff sells tickets for admission and seating in Wrigley Field for customers to watch Cubs games, as well as concessions and merchandise. Plaintiff incurs significant expenses to operate Wrigley Field and to compensate Cubs players, and has future renovations planned for Wrigley Field.

Plaintiff is the owner (by assignment from its predecessor) of the federally registered trademarks for "CHICAGO CUBS" (U.S. Registration 1548675), the Cubs logo (U.S. Registration 869838), and "CUBS" (U.S. Registration 3231136) (the "Marks"). For more than a century the Cubs have used the Marks including the words CUB or CUBS and various designs of a bear logo to identify the team and its ballgames, and certain consumers associate the Marks with the Cubs.

*b. Wrigley View*

Wrigley View is a rooftop business located adjacent to Wrigley Field, offering views of the Chicago skyline, Lake Michigan, and Wrigley Field. The premises include stadium-style bleacher seating and a skydeck on the rooftop that can accommodate up to 200 guests. From the seats at Wrigley View, customers can see into Wrigley Field over the barriers of the stadium. Defendants sell tickets to the rooftop on days there are games and events at Wrigley Field; in fact, it is only open for business on game days and days with other Wrigley Field events. The Wrigley View website includes a schedule of the Cubs' home games with hyperlinks to purchase tickets, comparing the Wrigley View experience to that of a ballgame at Wrigley Field. Defendants also advertise their business on its website and social media platforms, including Facebook, TikTok, X, Instagram, and LinkedIn.

The sole source of revenue for Wrigley View is selling tickets to its customers for admission to the rooftop, which includes unlimited ballpark-style concessions. Defendants charge guests approximately $125 to $150 per person to purchase tickets, but prices vary depending on, for instance, the opposing team's popularity. Defendants' business made a significant amount of gross ticket sale revenue in 2024 and the first half of 2025.

Defendants made renovations to their rooftop to allow for clean sight lines into Wrigley Field to sell more tickets. However, in the spring of 2024, Plaintiff installed four semi-transparent mesh screens obstructing the view from Defendants' rooftop into Wrigley Field. Defendants have continued to sell tickets to view Cubs games and concerts at Wrigley Field since the screen was erected.

*c. The Agreement*

Plaintiff's predecessor-in-interest entered into a settlement agreement on January 27, 2004 (the "Agreement") with several rooftops surrounding Wrigley Field, including the predecessor to Wrigley View. The Agreement required each rooftop, including Defendants', to pay Plaintiff 17% of their Gross Revenues annually and 11% of Billboard Revenue for the duration of the Agreement. In exchange for making royalty payments as part of the Agreement, Defendants were granted rights to sell tickets to watch Cubs games from its rooftop, use certain Cubs trademarks, and advertise that they are endorsed by the Cubs. Defendants exercised these rights during the term of the Agreement.

The term of the Agreement ended on December 31, 2023. Before expiration of the Agreement, Dunican received a letter from Plaintiff's outside counsel stating that when the Agreement term ended, Defendants would no longer have the rights to sell tickets and use Cubs trademarks. The letter adds that "if you and the Cubs do not enter a new agreement by December 8, 2023, the Cubs will not engage in further discussions regarding calendar year 2024 and you will not be able to obtain any right or license from the Cubs for 2024."

On November 21, 2023, the Cubs sent Defendants a draft of a new proposed agreement permitting Defendants to continue operating. The new proposed agreement provided for increased royalties payments to the Cubs for ballgames and Wrigley Field events, and it removed the right for Defendants to use the Marks. Defendants did not enter into the proposed agreement with the Cubs in 2023 or any time thereafter. Since the previous Agreement expired on December 31, 2023, Defendants have not paid the Cubs any royalty or otherwise paid any amount of money to the Cubs. Accordingly, Wrigley View was not "an official Cubs partner" in 2024 or 2025.

*d. Defendants' Post-Agreement Conduct*

After the expiration of the Agreement, Defendants continued to operate their rooftop business and sell tickets to the experience of watching live Cubs ballgames. Upon receiving a copy of

the complaint in this case, Dunican informed Wrigley View employees and Defendants' independent website developer that all marketing materials and the Wrigley View website had to be free of the Marks. Defendants reviewed and removed certain references to the Cubs, including changing its ticket names to simply "Chicago vs. [the opposing team]." However, following the filing of the complaint in this matter, the Wrigley View website still included a PDF brochure containing the Cubs logo. Defendants also continued to include the statement "Official Partner of the Cubs" in its marketing through 2025.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). When determining whether a genuine issue of material fact exists, the Court must view all evidence and draw all reasonable inferences in favor of the nonmoving party. *Id.* at 255; *Hackett v. City of South Bend,* 956 F.3d 504, 507 (7th Cir. 2020). After "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson,* 477 U.S. at 255 (citation omitted).

## DISCUSSION

### I. Plaintiff's Motion for Summary Judgment

Plaintiff moves for summary judgment on each of its claims. The Court views the evidence and draws all reasonable inferences in favor of Defendants for the purpose of Plaintiff's motion.

*a. Misappropriation*

In Count I, Plaintiff alleges that Defendants continue to misappropriate its property, namely the experience of live games and events it hosts at Wrigley Field. To prevail on its claim, Plaintiff must provide evidence that (1) it "created a product through extensive time, labor, skill or money," (2) Defendants "used [its] product in competition with [Plaintiff], gaining a special advantage … because [Defendants] bore little or no burden of the expense of development," and (3) Defendants' use of Plaintiff's product caused "commercial damage." *McNabb Bennett & Assocs., Inc. v. Terp Meyers Architects,* 1987 WL 7817, at *6 (N.D. Ill. Mar. 10, 1987) (Williams, J.).

Defendants argue that Plaintiff's misappropriation claim must fail "as a matter of law" because the cases Plaintiff cites are preempted by the Copyright Act, and thus Plaintiff "has identified no statute or controlling authority" recognizing its asserted property rights. This argument is puzzling, because the Copyright Act has no bearing on this case. The Copyright Act preempts "all legal and equitable rights … equivalent to … the exclusive rights within the general scope of [copyright law]" and are "in a tangible medium … and come within the subject matter of copyright." 17 U.S.C. § 301(a).

Plaintiff's asserted right is not equivalent to any of the rights within the scope of copyright protections. Copyright law protects "original works of authorship fixed in any tangible medium of expression …." 17 U.S.C. § 102(a) (emphasis added). The product at issue here is not a work of authorship nor in a tangible medium (such as a broadcast or recording). Plaintiff asserts rights over Cubs games and live spectator events themselves. Because the experience of watching a game at Wrigley Field does not fall within the domain of copyright, Plaintiff's misappropriation claim is not preempted by the Copyright Act.

Defendants also argue that Plaintiff asks this Court to "recognize a new property right in the visibility of a live sporting event from neighboring private property." That right, however, was recognized nearly ninety years ago by *Pittsburgh Athletic Co. v. KQV Broadcasting Co.*, which is widely

viewed as the leading precedent on this issue. 24 F. Supp. 490, 492 (W.D. Pa. 1938). Like the Cubs, the plaintiff in *Pittsburgh Athletic Co.* "ha[d], at great expense, acquired and maintain[ed] a baseball park, [and] pa[id] the players who participate in the game" (namely, the Pittsburgh Pirates). *Id.* And like Wrigley Field, the plaintiff's ballpark was "enclosed by high fences and structures so that the public are admitted … to witness the games … by the payment of an admission ticket." *Id.* at 491. The defendant radio station had positioned observers at high vantage points to watch the ballgames over the fences and broadcast live play-by-play descriptions, despite lacking authorization to do so. Defendant sought to "justify its action on the ground that … its observers [were] stationed on its own property without trespassing on plaintiffs' property." *Id.* at 493.

The *Pittsburgh Athletic Co.* court held that sports clubs have the "right, title and interest in and to the baseball games played within the parks." *Id.* at 494. Consequently, defendant's conduct "wrongfully deprive[d] the plaintiffs and each of them of the just benefits of their labors and expenditures in respect of the baseball games." *Id.* The *Pittsburgh Athletic Co.* view has been affirmed by judges across jurisdictions. *See Right Field Rooftops, LLC v. Chicago Baseball Holdings, LLC*, 87 F. Supp. 3d 874, 888 (N.D. Ill. 2015) (Kendall, J.) (finding the Cubs not limited by the antitrust laws "with respect to what they do with and how they distribute their own product, in this case, live Cubs games"); *see also In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1144 (9th Cir. 2019) (agreeing that "sports teams had a property interest in their games"); *Nat'l Ass'n of Broadcasters v. Copyright Royalty Tribunal*, 675 F.2d 367, 378 (D.C. Cir. 1982) (recognizing that "sports clubs did own a property interest in their games and could sell that right as they saw fit"). This Court joins in adopting the reasoning of *Pittsburgh Athletic Co.* and finds that Plaintiff possesses a right in the Cubs' games and in "the just benefits of their labors and expenditures" to host them.

Proceeding to the first element of misappropriation, the evidence shows that Plaintiff incurs significant costs to host games and events at Wrigley Field. According to the evidence, the average

Wrigley Field attendance approached 30,000 patrons in 2023 and 2024. The Cubs' corporate representative agreed that it costs "millions" of dollars to operate Plaintiff's business. The record shows Plaintiff's expenses include ballpark operations; construction and equipment; managing the Cubs team; and food, beverage, and staffing costs. Even drawing reasonable inferences in favor of Defendant, it is not reasonable to infer that Plaintiff does not invest significant time, labor, and expenses in hosting ballgames, considering the massive scale of its business and customer base.

Second, Defendants sell access to the same live ballgames as Plaintiff, without "the expense of develop[ing]" the games. Cubs games are essential to Defendants' business. Defendants include the Cubs' schedule on their website; require guests to arrive no earlier 60 minutes before the first pitch and vacate within 30 minutes of the game's conclusion; specifies the particular Cubs' game for which the customer purchased tickets (e.g., "Cubs vs Twins"); and only operates on days when there are events taking place at Wrigley Field. There is no genuine dispute that, although Defendants capitalize off Plaintiff's efforts, they have not paid royalties or otherwise contributed to the costs necessary to host Cubs games since 2023.

Third, the evidence establishes that Defendants' conduct caused a degree of commercial damage to Plaintiff. Cubs fans may purchase tickets to watch a ballgame from Defendants' rooftop rather than from Wrigley Field (or another licensed rooftop that pays Plaintiff royalties). In addition, the evidence shows that patrons' only alternatives to watching the live ballgames from Wrigley View are to watch the games from Wrigley Field or other surrounding rooftops; Defendants admit that all other rooftops pay royalties Plaintiff. Viewing the facts in a light most favorable to Defendant, the Court infers that not *every* dollar would have otherwise gone to Plaintiff—some patrons may not have paid to a ticket to Wrigley Field due to ticket prices or lack of adequate space for an event. However, the facts show that Defendants' operations deprive Plaintiff of at least part of the revenue it would have received from Wrigley View patrons.

Even viewing the evidence in a light most favorable to Defendants, no reasonable jury could conclude that Defendants were merely running a rooftop business. Nor could a reasonable jury conclude that Defendants made any financial contribution to create Plaintiff's product, or that Plaintiff did not lose revenue. Therefore, summary judgment in favor of Plaintiff is proper as to Count I.

*b. Unjust Enrichment*

In Count II, Plaintiff alleges that Defendants are unjustly enriched by their misappropriation of its live-game experience. Because unjust enrichment claims "rest[] on the same improper conduct alleged in another claim," it will "stand or fall with" Plaintiff's misappropriation claim. *Cleary v. Philip Morris, Inc.*, 656 F.3d 511, 517 (7th Cir. 2011). As the Court explained above, Plaintiff successfully established its misappropriation claim. To state a subsequent claim for unjust enrichment, Plaintiff must next establish (1) Defendants have unjustly retained a benefit to Plaintiff's detriment and (2) Defendants' retention of the benefit "violates the fundamental principles of justice, equity, and good conscience." *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 516 (7th Cir. 2011) (citing *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 679 (Ill. 1989)).

Courts have found a benefit "unjust" where "(1) the benefit should have been given to the plaintiff, but [a] third party mistakenly gave it to the defendant … (2) the defendant procured the benefit from the third party through some type of wrongful conduct … or (3) the plaintiff … had a better claim to the benefit than the defendant." *HPI Health Care Servs.*, 545 N.E.2d at 679 (internal citations omitted). Again, the undisputed facts show that Defendants profited from ticket sales to watch Cubs games, without contributing financially to the ballgames and without acquiring a right to sell Plaintiff's product. Unfairly capitalizing on another's labor and expenses offends principles of justice, equity, and good conscience.

Therefore, the Court grants summary judgment in favor of Plaintiff as to Count II.

*c. Trademark Infringement and Federal Unfair Competition*

In Counts III and IV, Plaintiff alleges claims under the Lanham Act for trademark infringement[1] and unfair competition. *See* 15 U.S.C. § 1114(1)(a) (infringement of registered trademarks); 15 U.S.C. § 1125(a) (unfair competition). Claims for trademark infringement and unfair competition "both require (1) that [Plaintiff's] mark be validly registered and (2) that [Defendants'] use be likely to cause confusion among consumers." *Uncommon, LLC v. Spigen, Inc.*, 926 F.3d 409, 419 (7th Cir. 2019); *see also Lynn Scott, LLC v. Grubhub Inc.*, 2024 WL 3673718, at *3 (N.D. Ill. Aug. 6, 2024) (Hunt, J.) (applying same factors to trademark infringement and unfair competition claims under the Lanham Act).

The parties do not dispute that Plaintiff by assignment owns federally registered trademarks for each of the Marks at issue, which include the Cubs' red "C" logo as well as the names "CUBS" and "CHICAGO CUBS." "Once a trademark is registered, there is a presumption as to its validity absent proof of a legal defense or defect." *See Illinois Tamale Co., Inc. v. LC Trademarks, Inc.*, 164 F.4th 648, 656 (7th Cir. 2026); 15 U.S.C. § 1115(a). Defendants have not shown any genuine dispute of material fact as to the validity of Plaintiff's Marks. Absent that proof, the Court presumes Plaintiff's Marks are protectable. *See Packman v. Chicago Trib. Co.*, 267 F.3d 628, 638 (7th Cir. 2001).

Regarding the second requirement, courts in this District find that "the use of a trademark after a license agreement's termination by itself establishes a likelihood of confusion." *See In re XMH Corp.*, 647 F.3d 690, 695 (7th Cir. 2011). Plaintiff showed undisputedly that the marks Defendant used were identical to Plaintiff's Marks, so there is no question as to their similarity. There is also no

---

[1] Defendants previously submitted several affirmative defenses including implied license, acquiescence, and unclean hands. However, Defendants did not develop them in response to Plaintiff's motion. Defendants have therefore waived their affirmative defenses. *See Bakov v. Consol. World Travel, Inc.*, 2020 WL 10963926, at *2 (N.D. Ill. Apr. 21, 2020) (Leinenweber, J.) (holding defendant waived affirmative defenses by not developing them in its response brief to plaintiff's motion for summary judgment or in its own summary judgment motion).

genuine dispute that Defendants used the Marks in their advertising materials and online after the Agreement expired. While Defendants emphasize that Dunican and Borkowski instructed employees not to use Cubs logos and trademarks, that evidence does not shield Defendants from liability. The Lanham Act is a strict liability statute. *Hard Rock Cafe Licensing Corp. v. Concession Servs., Inc.*, 955 F.2d 1143, 1152 n. 6 (7th Cir. 1992) ("Sellers bear strict liability for violations of the Lanham Act.").[2]

Common sense dictates that there is a likelihood of customer confusion where Defendants continue to use marks associated with the Cubs, especially when used within the same class: "entertainment services, namely, baseball games, competitions and exhibitions rendered live …." There is a considerable risk that those consumers would reasonably, but mistakenly, believe that Defendants' business was sponsored and/or approved by the Cubs. The record evidence supports this conclusion. Wrigley View's corporate representative, Jennifer Borkowski, testified that she received customer communications "where they were confused about whether or not Wrigley View was part of Wrigley Field."

The evidence in this case creates no genuine dispute as to the protectability of Plaintiff's Marks nor the likelihood of customer confusion from Defendant's use of the Marks. Summary judgment is therefore proper as to Count III.

*d. State Law Unfair Competition*

In Counts VI, and VII, Plaintiff claims violations of the Illinois Uniform Trade Practices Act, 815 ILCS § 510/2 (the "UDTPA"),[3] and two theories of unfair competition under Illinois common

[2] For the same reason, the Court rejects Defendants' argument that "a reasonable jury could conclude that any remaining use resulted from the transition away from a twenty-year authorized relationship and innocent mistakes, not from willful infringement or bad faith."

[3] A claim under UDTPA claim requires that the trade practice occur primarily in Illinois. The record establishes that Wrigley Field and Wrigley View are both located in Illinois; thus, this element is satisfied. *See Specht v. Google, Inc.*, 660 F. Supp. 2d 858, 866 (N.D. Ill. 2009) (Leinenweber, J.) (finding plaintiffs established a factual nexus between defendants and Illinois because plaintiff's business was in Illinois and therefore damage suffered from the alleged misconduct was in Illinois) (citing *Avery v. State Farm Mut. Auto. Ins. Co.,* 216 Ill.2d 100, 296 Ill.Dec. 448, 835 N.E.2d 801, 853–54 (2005)).

law: trademark infringement and misappropriation. Where a plaintiff's factual allegations under UDTPA also "form the basis for plaintiff's claim under the Lanham Act, the legal inquiry is the same under both statutes." *Gimix, Inc. v. JS & A Group, Inc.,* 699 F.2d 901, 908 (7th Cir.1983). As for Plaintiff's claim under Illinois common law, Illinois courts treat a claim for misappropriation "essentially the same" as an unfair competition claim. *Chi. Bd. Options Exch., Inc. v. Int'l Sec. Exch., L.L.C.*, 2012 IL App (1st) 102228, 973 N.E.2d 390, 396 (2012).

As the Court finds that Plaintiff is entitled to summary judgment on its trademark infringement claim and its misappropriation claim, summary judgment is also proper as to both Plaintiff's UDTPA claim and its Illinois common law unfair competition claim.

*e. False Advertising*

In Count V, Plaintiff claims that Defendants falsely advertised that they are affiliated with and endorsed by the Cubs. The Lanham Act prohibits false or misleading "commercial advertising or promotion" that "misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities." 15 U.S.C. § 1125(a)(1)(B). To establish a false advertising claim, Plaintiff must show (1) a false statement of fact by Defendants in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) Defendants caused their false statement to enter interstate commerce; and (5) Plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a loss of goodwill associated with its products. *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 819 (7th Cir.1999).

*i. Falsity and Deception*

The undisputed falsity of Defendants' statements satisfies the first two elements. First, Defendants admit that they no longer had the right to claim their business was endorsed by the Cubs

after the Agreement expired. Second, literally false statements "will necessarily deceive consumers." *Eli Lilly and Co. v. Arla Foods, Inc.*, 893 F.3d 375, 382 (7th Cir. 2018); *Schering-Plough Healthcare Products, Inc. v. Schwarz Pharma, Inc.*, 586 F.3d 500, 512 (7th Cir. 2009) (under Lanham Act, "a representation may be so obviously misleading that there is no need to gather evidence that anyone was confused"). Because a likelihood of deception is presumed by virtue of the literal falsity of Defendants' statements, extrinsic evidence of consumer confusion is not required. *Eli Lilly*, 893 F.3d at 382.

*ii. Materiality*

Plaintiff also must show that the deception caused by the false statement was material to customers. Defendants specifically challenge this element, arguing that there remain genuine factual disputes as to the materiality of the statements. While deception may be presumed for a literally false statement, there is no such presumption for materiality. Thus, Plaintiff must show that Defendants' statements "likely influenced" customers' decision to patronize Wrigley View.

No doubt Plaintiff has shown that Defendants' statement is a direct departure from the facts. However, Plaintiff offers insufficient evidence establishing that consumers are more likely to purchase tickets to establishments that are partnered with or endorsed by the Cubs, than those that are not. Courts have found in some cases that materiality can be presumed where statement is about a characteristic inherent to the product. *See LG Elecs. U.S.A., Inc. v. Whirlpool Corp.*, 2010 WL 3397358, at *14 (N.D. Ill. Aug. 24, 2010) (St. Eve, J.) (citing *Cashmere and Camelhair Mfr. v. Saks Fifth Ave.,* 284 F.3d 302 (1st Cir. 2002) ("One method of establishing materiality includes showing that the false or misleading statement relates to an 'inherent qualify or characteristic' of the product.")). An official partnership with the Cubs is not an inherent characteristic to the business of viewing the Cubs' games. Statements inherent to the Cubs game experience might be about, for example, how good the view of the ballpark is from the rooftop.

The record does not indisputably show that Defendants' false statements "likely influenced" customers to patronize Wrigley View. Drawing all reasonable inferences in favor of Defendants, Plaintiff has not established that no reasonable jury could conclude Defendants' statements were material. *See Not Dead Yet Mfg. Inc. v. Pride Sols., LLC,* 2018 WL 688324, at *10 (N.D. Ill. Feb. 2, 2018) (Pallmeyer, J.) (granting summary judgment on Lanham Act false advertising claim based on lack of evidence that statement was material).

For that reason, the Court denies summary judgment as to Count V.

**II. Defendants' Motion for Summary Judgment**

Defendants likewise move for summary judgment on each of Plaintiff's claims. Having granted summary judgment in favor of Plaintiff for each of its claims besides Count V, the Court limits discussion of Defendant's motion to Plaintiff's sole remaining false advertising claim. The Court also considers Defendants' argument that Dunican cannot be held personally liable on any count.

*a. Plaintiff's False Advertising Claim*

Defendants' argument in support of their own summary judgment motion mirrors their argument in opposition to Plaintiff's motion: Plaintiff has not introduced evidence that any false statements were material. While Plaintiff argues that Defendants "do not dispute the facts underlying [its] false advertising claim," Defendants' statements were not undeniably likely to influence customers' purchasing decisions such that there is no genuine dispute as to their materiality. It is true that Plaintiff is not required to prove Defendants' statements *actually* influenced customers, and there is no consensus as to what evidence is sufficient to show materiality. In cases where materiality was in dispute, courts have found evidence such as witness testimony or surveys regarding a statement's importance sufficient to raise an inference of materiality. *See, e.g., Skydive Arizona, Inc. v. Quattrocchi,* 2009 WL 6597892, at *27 (D. Ariz. Feb. 2, 2009), *aff'd*, 673 F.3d 1105 (9th Cir. 2012) (witness testimony); *Healthport Corp. v. Tanita Corp. of Am.,* 563 F. Supp. 2d 1169, 1180 (D. Or. 2008) (same);

*JTH Tax, Inc. v. H&R Block Eastern Tax Servs.*, 28 Fed. Appx. 207, 214 (4th Cir. 2002) (survey evidence); Sanderson *Farms, Inc. v. Tyson Foods, Inc.*, 547 F. Supp. 2d 491, 508 (D. Md. 2008) (same). Here, the record contains no showing that Defendants' statements were likely to influence customer's decisions, nor that they were inherent to Defendants' product. Plaintiff bore the burden of providing evidence to prove its claim, and a reasonable jury could not find in Plaintiff's favor without it.

Therefore, the Court grants summary judgment in favor of Defendants as to Count V.

*b. Summary Judgment as to Dunican*

Defendants argue that there is no justification to "pierce the corporate veil" to hold Dunican liable for Wrigley View's conduct and are "no facts that would support [his] personal liability." They claim Plaintiff cannot show that Dunican "personally participated in, authorized, or directed" tortious conduct, making summary judgment inappropriate as to Dunican individually. Plaintiff responds that it does not intend to pursue a veil-piercing or alter ago theory, but to hold Dunican liable for his own participation in and control of Wrigley View's operations.

In Illinois, "corporate officers are liable for torts if they participated in the conduct giving rise to that liability." *Itofca, Inc. v. Hellhake*, 8 F.3d 1202, 1204 (7th Cir. 1993). The parties do not dispute that Dunican is the sole owner and officer of Wrigley View, thereby participating in Defendants' unfair business practices. As to Plaintiff's infringement claims, courts in this District recognize that individuals "who ha[ve] the ability to supervise infringing activity and ha[ve] a financial interest in that activity" can be held liable for that infringement. *Hard Rock Café Licensing Corp. v. Concession Services, Inc.,* 955 F.2d 1143, 1150 (7th Cir.1992). Plaintiff proffered evidence that Wrigley View's marketing falls wholly in Dunican's control, including Dunican's testimony that "the buck stops with him" with regard to Wrigley View's messaging, and that "the marketing arm of [Wrigley View] would not do anything without [his] agreement or approval."

Based on the undisputed evidence, Dunican cannot establish that he is entitled to judgment as a matter of law with respect to his personal participation in the misconduct. to the Court therefore denies summary judgment in favor of Dunican on Plaintiff's remaining claims.

## III. Plaintiff's Motion for a Permanent Injunction

Finally, Plaintiff seeks a permanent injunction enjoining Defendants from doing the following without Plaintiff's written consent: (a) using the Marks or any other intellectual property; (b) claiming a partnership, affiliation, or endorsement by the Cubs; and (c) selling tickets to view events at Wrigley Field or engaging in any other commercial activities related to the Cubs. A permanent injunction, as opposed to a temporary restraining order or a preliminary injunction, "is not provisional in nature." It is a final judgment. Therefore, the first issue "is not whether Plaintiff has demonstrated a reasonable *likelihood* of success on the merits, but whether it has *in fact* succeeded on the merits." *Plummer v. Am. Inst. of Certified Pub. Accts.*, 97 F.3d 220, 229 (7th Cir. 1996) (emphasis in original). The Court has found that Plaintiff succeeded on each of its claims except its false advertising claim. Thus, the Court will not enjoin Defendants from including any particular statements in its advertising materials, insofar as those statements would not otherwise violate any injunction issued by the Court.

With respect to Plaintiff's other claims, after demonstrating that it has succeeded on the merits of its case, the moving party must demonstrate that (1) it has suffered an irreparable injury; (2) remedies available at law … are inadequate to compensate for that injury; (3) considering the balance of hardships between the parties, a remedy in equity is warranted; and (4) that the injunction is not contrary to the public interest. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

### *a. Irreparable Injury and Inadequate Remedies*

Plaintiff claims that it suffered irreparable injury through damage to its goodwill, and absent injunctive relief. (citing *Re/Max N. Cent., Inc. v. Cook*, 272 F.3d 424, 432 (7th Cir. 2001)). In the Seventh Circuit, "[i]rreparable harm is generally presumed in cases of trademark infringement …."

*Eli Lilly & Co. v. Nat. Answers, Inc.*, 233 F.3d 456, 469 (7th Cir. 2000) (citing *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 15–16 (7th Cir. 1992) (recognizing the "well-established presumption that injuries arising from Lanham Act violations are irreparable, even absent a showing of business loss")). For instance, the evidence shows that Wrigley View received negative feedback online, including that its staff was "very rude and not accommodating," that the business will "rip you off," and that the business did not adhere to the terms of its customer contract. Plaintiff has shown that Defendants' conduct "poses unmistakable peril to [the Cubs'] goodwill." *See Bulgari, S.P.A. v. Zou Xiaohong,* 2015 WL 6083202, at *3 (N.D. Ill. Oct. 15, 2015) (Coleman, J.)

The Court finds further that there is no other? adequate remedy at law in this case. Courts regularly hold that there is no other? adequate remedy at law for a victim of trademark infringement. *See Promatek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 813 (7th Cir. 2002) (finding injunctive relief proper because of "the difficulty in assessing damages associated with a loss of goodwill"). Further, the fact that Defendants ceased using Plaintiff's Marks does not preclude injunctive relief. The Seventh Circuit has recognized that a party's "discontinuation of unlawful conduct does not make the dispute moot," and "[a]n injunction remains appropriate to ensure that the misconduct does not recur as soon as the case ends." *BMG Music v. Gonzalez*, 430 F.3d 888, 893 (7th Cir. 2005).

Plaintiff also could not be adequately compensated if Defendants were to continue misappropriating Cubs games indefinitely. Where the offending conduct continues indefinitely, there is no practicable way to calculate such harm and a remedy at law is inadequate. *See, e.g.*, *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of USA, Inc.*, 549 F.3d 1079, 1095 (7th Cir. 2008) (noting that one "circumstance leading to an inadequate legal remedy is when the nature of the loss incurred by the plaintiff makes it difficult to calculate damages"); *Newark Owens Wolf, Inc. v. Owens*, 514 F.3d 630, 632 (7th Cir. 2005) ("[I]t is precisely the difficulty of pinning down what business has been or will be lost that makes an injury 'irreparable.'")

Defendants' cited case, *Right Field Rooftops, LLC v. Chicago Baseball Holdings, LLC*, supports this conclusion. In that case, the owners of another rooftop adjacent to Wrigley Field moved for a temporary restraining order enjoining the Cubs from obstructing the view of ballpark. The court found that the plaintiffs could not show an inadequate remedy at law, because the provisional injunction would be effective for a limited time, makingany harm "ascertainable" and "calculable." *See* 80 F. Supp. 3d 829, 836 (N.D. Ill. 2015) (Kendall, J.).

Here Plaintiff has shown that Defendants were unjustly enriched by misappropriating Plaintiff's right to its product, the live baseball game experience. Absent an injunction from using this business model, Plaintiff would have to compete with Defendants in selling tickets to its *own* ballgames while Defendants get a "free ride." *See Westrock Co. & Victory Packaging, LP v. Dillon*, 2021 WL 6064038, at *20 (N.D. Ill. Dec. 22, 2021) (Blakey, J.) (finding that "absent an appropriate injunction relating to its misappropriation claims, [a plaintiff] may suffer irreparable harm that cannot be sufficiently remedied at law").

*b. Balance of Hardships*

The balance of the hardships here favors Plaintiff. First, there is no evidence that Defendants would suffer harm if enjoined from violating Plaintiff's intellectual property rights. *See also Luxottica Grp. S.p.A. v. Hao Li*, 2017 WL 621966, at *6 (N.D. Ill. Feb. 15, 2017) (Shah, J.) (finding defendant would not suffer harm "from being enjoined from violating the law" in trademark infringement case). Further, ill-gotten monetary benefits that Defendants receive from their actions "are not benefits to be protected from injury." *MetroPCS v. Devor*, 215 F. Supp. 3d 626, 640 (Shadur, J.) (N.D. Ill. 2016) ( (internal citation omitted)).

Defendants would not be prevented from using their property and marketing its business in a manner that is not entirely built around selling access the Cubs' live games. *See Re/Max N. Cent., Inc.*, 272 F.3d at 433 (finding injunction would not cause harm to business owner who could "maintain her

same office and listings"). Like the rooftop business in *Right Field Rooftops*, Defendants' business "within the Wrigleyville community with a license to serve alcohol would plausibly have some marketability, and one with outdoor dining would seem to have even more." 87 F. Supp. 3d at 893. Defendants can "run a business—maybe not the business they are in now—but certainly a business." *Id.* However, the Cubs would suffer injury to its goodwill and commercial losses absent an injunction if Defendants resume their conduct. The Court finds that the balance of hardships favors Plaintiff.

*c. Public Interest*

Lastly, the Court finds that a permanent injunction in this case promotes the public interest. Courts widely recognize that protecting the intellectual property rights of trademark owners and preventing customer confusion is in the public interest. *See Promatek Industries, Ltd. v. Equitrac Corp.*, 300 F.3d 808, 813–814 (7th Cir. 2002); *Hyatt Corp. v. Hyatt Legal Servs.*, 736 F.2d 1153, 1159 (7th Cir. 1984) ("The public has an interest in the protection of trademarks and trade names."). It is also in public's interest to protect individuals' rights in the products and benefits yielded by their labor and expenditures.

Having met each of the requirements for a permanent injunction, the Court enjoins Defendants, absent Plaintiff's express written consent, from (1) using the identified Marks (including Cubs logos and trade names) so as to indicate association, endorsement, or approval from Plaintiff; and (2) selling tickets to provide the experience of viewing live Cubs games and events at Wrigley Field. The Court considers all other issues brought by both parties resolved.

**CONCLUSION**

For these reasons, the Court denies Defendants' Motion to Strike [142]; grants in part and denies in part Plaintiff's Motion for Summary Judgment and a Preliminary Injunction [96]; and grants in part and denies in part Defendants' Motion for Summary Judgment [155].

**IT IS SO ORDERED.**

Date: 9/30/2026

Entered: ______________________________
SHARON JOHNSON COLEMAN
United States District Judge